Mr. Chief Justice Marshal!,
 

 delivered the opinion of the Court.-—
 

 This action was brought qn- nine bills of exchange, drawn by-John C. Delprat, on the plaintiffs, and endorsed by the defendants, a list of which follows:
 

 Baltimore; May 23,1822, J05OO favour of J. P. Kraft.
 

 " 27 200 favour of defendants.
 

 300 “
 

 500 - “
 

 June 12’ 1,000 £i
 

 “■ 18 300 “
 

 July. 31 1,000 «' fr. 10,000 “
 

 “ “ “ « 5,000- «
 

 These bills were regularly protested for non-acceptance and non-payment; but were accepted and paid,
 
 supra protest,
 
 by the drawees, for the honour of the defendants theendorsers. The jury •found a verdict for the plaintiffs, subject to the opinion of the Court, on a case stated. The Judges were divided in opinion, on the following points, which have been certified to this Court.—
 

 1. Whether the authority to John C. Delprat to draw on the plaintiffs, did, or did not, amount to an acceptance of the bills.
 

 2. Whether the bills paid by the plaintiffs,
 
 supra protest,,
 
 for the honour of the defendants, were drawn and negotiated in conformity to the authority and instructions of the plaintiffs to J. C. Delprat.
 

 3. Whether the plaintiffs were bound to accept and pay the bills in question, and whether the same having been paid by the plaintiffs,
 
 supra protest,
 
 for the honour of the defendants;’the plaintiffs are entitled to recover the amount of the defendants..
 

 4. Whether J. C. Delprat was a competent witness.-
 

 5. Whether the letter offered by the plaintiffs in evidence, and rejected, ought to have been admitted.
 

 6. Whether the plaintiffs are entitled to a judgment bn the verdict of the jury.
 

 These questions require an examination of the relations which existed between the drawer of these bills, and the drawee's.
 

 On tl^e 11th January 1818, the plaintiffs entered into a contract ■with" John C. Delprat, of which the following is a copy: — >
 

 The undersigned N. and J. and R. Van Staphorst, merchants, in this city, and John C. Délprat of Philadelphia, present the
 
 *275
 
 last, choosing for the present act his
 
 domicilium ciiandi et exe~ quendi,
 
 at the office of the youngest notary here, have entered with one another into the following arrangement and stipulations:—
 

 Article I. The second undersigned ■ (Viz. J. C, JDelprat) shall, to the benefit of the first undersigned (N. and J. and R. V. S.) manage in' the United- States of America, the mercantile-interest' of said first’under-signed, consisting chiefly in. the forming of new solid connexions, and procuring of consignments ; and shall further perform every thing' the first undersigned will appoint him tó do as their agent..
 

 Art. II. The second undersigned, binds himself to procure to no person or persons in this kingdom, any consignments or commissions from himself or any other, except, to the first undersigned; but on the contrary, to use his utmost exertions towards the benefit of the mercantile house of the first undersigned, they being willing on their side to facilitate all such commercial operations as might benefit the second undersigned, without their prejudice.
 

 Art. III. The first undersigned allows to the second undersigned
 
 the. faculty to value
 
 on them direct, or payable in London, at no shorter date than sixty days sight,
 
 for such moneys
 
 as the .setond undersigned shall employ to
 
 make advances
 
 on whole or part of cargoes of current articles, viz. to the amount of two thirds of the invoice price of articles laden in chartered vessels, and of three-fourths in vessels" owning to the shippers, and likewise
 
 consigned
 
 to the first undersigned; it being left to the knowledge and prudence of the second undersigned to judge of the invoice price of the aforementioned goods; and it
 
 being understood
 
 that the seepnd undersigned, at the same time that he gives'advice of his drafts furnished in the above manner, shall enclose and forward, or cause to be enclosed and forwarded, to. the first undersigned, the bill of lading and invoice of the goods on which the above mentioned advances might have been made;- and shall cause the above goods to be.duly insured in America, to that effect, that the policy of said insurance be delivered up, duly endorsed, to the second undersigned,
 
 and rests with him until the end of the expedition.
 
 It being further a fixed rule, that thé first undersigned must never come in the predicament of having made, any advances on cargoes or part of cargoes, which are not duly insured in America.
 

 The first undersigned
 
 further
 
 oblige themselves to open a credit of $$40,000, say forty thousand dollars, with Messrs. Le Roy, Bayard & Co. New-York,
 
 to be made use of by the second undersigned, in case any advances are required on consignments to be made to the said first undersigned, that credit to be renewed
 
 
 *276
 

 every time by the said first, undersigned,
 
 after the arrivement of the consigned goods shall have been duly advised by them.
 

 If, however, against all probability,- it happened that the multiplicity of consignments rendered it desirable to the first undersigned, to stop' for a while further consignments, then the' said, first undersigned retain the faculty to prescribe to the second undersigned such
 
 limits and orders
 
 as they shall find-proper according to circumstances, which orders and limits the second undersigned shall be obliged to follow.
 

 Akt. IV. As sometimes an opportunity might offer to procure a good
 
 consignment
 
 to the first undersigned, on condition of their taking an interest in that expedition,'they-authorize the second undersigned
 
 to make use likewise of the above mentioned credit of
 
 840,000,
 
 to interesHhe first undersigned ;
 
 in such expeditions for a proportion irot -larger than
 
 one-fourth,
 
 with this restriction, that said proportion must never exceed the amoupt of 810,000, say ten thousand dollars. The choice of the articles to be shipped to the first undersigned on_their own account;, being left to the- commercial knowledge of the second * undersigned. This authorization will be considered as renewed after the termination of each expe( ition, viz. after-that termination- shall have been duly advised to the second undersigned by the first undersigned.
 

 Art. V. That the first undersigned, in consideration of the services to be rendered by the second undersigned, shall grant ~ to the second undersigned,' one-third of the amount of the two per cent, commission, to be earned by the first undersigned on the. consignments to be procured, and further one per cent, from the’purchase of such goods which might be shipped for the account of the first undersigned, as is more amply specified in article 4; it is, to be understood, that then'no benefit arises from the third of tb° two per cent, commission of those goods; and finally, that the second undersigned is promised an allowance for travelling, and other expenses, the sum of 82,000, say two thousand dollars, per annnm, to commence with the first of February 1818.
 

 Art. VI. These arrangements shall last for the term of two consecutive years, and thus end with the last day of January 1820. It being understood that (in case of no denunciation to the contrary, made by any of the parties aforesaid) this contract will-be continued from year to year, but that in case one of the .parties should desire the annullation of the present contract, said party shall be obliged to signify his intention to the other party, four months before the. expiration thereof.
 

 Art. VII. Ultimately it has been- stipulated, that in the unhoped for and wholly unexpected case of any differences taking place' between the undersigned, respecting the fulfilment of any .
 
 *277
 
 of the articles above mentioned, those disputes or differences shall be- entirely adjusted and decided by the decision dftwo arbiters, to be chosen in the city of Amsterdam, one by each party, who in case of difference of opinion between them, shall have the faculty of appointing .a third or super arbiter, which arbiters then must decide and finally terminate all such differences;
 
 both parties renundating to all law measur.i. and impediments,
 
 and especially to the
 
 famity, of laying any. arrests, or hindrance, on moneys, goods, or possessions,
 
 belonging'to any one of the parties undersigned,
 
 all such aforesaid measures
 
 to be considered now ánd then as
 
 null, void, and of no effect whatsoever,.
 
 the - consequences thereof to be suffered by-the party which might have made use of the aforesaid measures.
 

 Of the- present act have been made two copies, &c.
 

 Amsterdam, WthJanuary
 
 1818.
 

 (Signed) N. 'Sc J. & R. Van Staphorst. .
 

 ■ John-.C. Delprat.
 

 .A copy of this contract was.transmitted by the plaintiffs to the defendants, in a letter dated the 21st of the same month, a copy of which follows:— ■
 

 Messrs. Le Roy, Bayard 8c Co. N. Yoi;k, (confidential.)
 

 Amsterdam,
 
 21 sí
 
 Jan.
 
 18Í8.
 

 Gentlemen — Thinking it useful for the extension of our commercial relations in the line of consignments, (one -of the branches of our establishment,) to appoint an agent to that 'purpose in the United' States of America, we have been decided by the confidence we place in the character and pommercial notions of Mr. John C. Delprat, to appoint that gentleman to the aforementioned trusts, in -which choice -we have chiefly-been directed by the reliance we have on the principles of loy-; alty and prudence, which must actuate a person employed during suchva long period by your worthy house. We judged it necessary for the obtaining of .said purpose, to leave at the disposal of Mr. Delprat,
 
 sufficient means tofadlitatehis exertions,
 
 viz. .by opening -with you in his favour^ a credit to be made'use of-by him, in the manner'pointed out in the
 
 enclosed abstract
 
 of our contract with said gentleman. We therefore request and authorize you to furnish Mr. Delprat to the extent of S40>@ti0,
 
 say forty thousand dollars, (to be made advances with by him on such cargoes or part thereof, as he might promre the consignment of to our house, and to be made use of to interest our house in part of cargoes to the forementioned purpose.)
 
 The credit to run for the space of two years, unless countermanded by us, in such a manner that when Mr. Delprat
 
 has availed himself of the whole or part of said credit
 
 o/'g40,000, that credit .or part of the same must be considered renewed when you receive our approbation of the said disposition of Mr. Delprat.
 

 
 *278
 
 You will observe the sole object of the mission of Mr. Del-prat, is to obtain solid consignments from good houses throughout the U. S., and. the disposal of the credit opened in his behalf with your house,
 
 is exclusively intended to facilitate said business.
 
 In this important matter, it will be a point of great security, and as such, eminently satisfactory to us, that our said agent may be able to have recourse in every circumstance, to wise and
 
 friendly counsel,
 
 .and we therefore request you to assist Mr. Delprat, as far as opportunity may offer, with the lessons of your long experience,
 
 particularly with respect to those transactions for which, by virtue of the credit aforementioned, we may have recourse to your cash, it being, as you will observe, a material point that we are secured, that the moneys he may dispose of will have no otherthan the destination just mentioned.
 
 To this effect, we authorize you, gentlemen,
 
 in case of moral certainty, that the moneys Mr. Delprat should demand from you
 
 by virtue of the abovementioned credit, would not be employed in the aforementioned manner, and earnestly request you
 
 not to pay
 
 and to refuse him any moneys whatsoever, on account of the above credit.
 

 In general, as a trust of this nature, which is to have its effect at such a-distance, is always a delicate matter, we must claim and dare expect from your known sentiments towards us, that you will give the strictest attention to the line of conduct followed by Mr. Delprat; and if, unexpectedly, that conduct-could appear in the least exceptionable, we mean either imprudent or equivocal,' then, gentlemen, do give us, with all the frankness of long experienced friendship, your ideas respecting that subject, and be perfectly secure that every information, of what nature soever, will not only be thankfully acknowledged by us, but received with the most religious secrecy. We have now, gentlemen, onjy to request your kind offices in favour of Mr. Delprat,
 
 and
 
 t.
 
 ,‘olicit your friendly co-operation towards the attaining the object of his mission,,
 
 which we are fully persuaded can be much facilitated by your kind recommendation to the numerous friends you have in different parts of your country. Be assured, gentlemen, of the high sense we have of the obligation we will have to you, for your friendly services through the whole of the business we" just now took the liberty to explain to you, and of the earnest desire we have"to be often in the opportunity of rendering' you the like,-or any services in our power. Referring for commercial*information to our general letter of this date, we .are, with sincere regard,
 

 Gentlemen, your most.obedient servants,
 

 N. & J. & R. Van Staphorst.
 

 (Endorsed,) Confidential. Amsterdam, 21st of January,1818,. N. and J. and R. Van Staphorst. Receivéd, March 29th. .Answered, , 24th do.
 

 
 *279
 
 This letter was answered by Le Roy, Bayard 8t Co. in the following terms
 

 PRIVATE.
 

 New-York, Mth of March
 
 1818.
 

 Messrs. N. & J. & R. Van Staphorst, Amsterdam.
 

 Gentlemen — We have the honour of replying to your esteemed favour of 21st of January, acquainting us with the arrangement you have made with our mutual friend, Mr. Delprat, who has undertaken the agency of procuring you consignments from this country. In the furtherance of the object, we shall be very happy to render our services useful, and beg to offer our best wishes for the success of Mr. Delprat’s operations in your'behalf.
 
 Due note
 
 is taken of the credit you are pleased to open to that gentleman with us, to the amount of 40,000 dollars, subject to renewal, as fully expressed in
 
 your letter.
 
 We doubt not from the knowledge we possess of Mr. Delprat’s character, that he will fully justify the confidence you repose in him; and though he may, under existing circumstances, find it difficult to enlarge to the extent that could be mutually wished, we are persuaded that no exertion will be wanted on Mr. Delprat’s part, to reap the utmost benefit from the mission intrusted to him.
 

 Believe us, with honour and esteem, gentlemen,
 

 Your obedient servants,
 

 • Le Roy, Bayard & Co.-
 

 •. It is proper to observe, that several merchants of Holland, whose agents the plaintiffs were, had ■ become large holders of government stock, and of shares in the Bank of the'United States. Le Roy, Bayard & Co. had been employed to draw the interest and dividends, and to remit them to Europe. The credit of 40,000 dollars, therefore, which was raised for Del-prat, with Le Roy, Bayard 8c Co., was merely the application of so much of their funds, in the United States, to the business of his agency, in aid of the bills he was authorized to draw on them. The.continuance or discontinuance of'this credit, might depend on the eligibility of continuing this mode of remittance, as well as on the withdrawal of their confidence'in their agent. Several letters passed between the plaintiffs and defendants, respecting their transactions in consequence of this credit; which manifest, unequivocally, the desire of the .plaintiffs that its amount should not be exceeded, but which betray no waiit of confidence in Delprat. • In a letter of the 24th June, 1819, they renew the credit of 40,000 dollars; and add, “at the same tíme, we .confirm our former orders not to exceed said amount, for' our account. In case you have funds in hand, for any' of our institutions, and you think proper to remit us for- the same, Mr. Delprat’s bills on us; the nature of which you are. well acquainted with; you allow him then, the same credit^
 
 *280
 
 which you'do to all persons from-whom, you'take hills, in the persuasion of their solidity, and of the réaÚty of the transaction on which the bills are issued.
 

 In- answer to this letter, thé defendants say, on the 24th of September, 1819: “You also accord us the permission to remit this gentleman’s, (Delprat’s) drafts, for any moneys we may have on'hand belonging to your various institutions. The confidence which we mutually have in this gentleman’s character, must, with us, act in lieu of vouchers, to exhibit the rer ality of transactions, - which may give origin to such drafts; the whole of this gentleman’s operations having been hitherto beyond our immediate knowledge.” ,
 

 This correspondence continued until the 12th of May, 1820, when N. & J. & R. Van Staphorst addressed a letter to Messrs. Le Roy, Bayard & Co. of which the following is an extract:
 

 “ There being frequent opportunities of drawing here, now, on New-York, we will probably have, for some time to come, occasion to dispose of the dividends which
 
 “
 
 you will receive for our account, in October next,” and so on; and we have there?fore directed Mr.- Delprat not to make use of his credit of 5540,000, lately opened in his favour. We thus also request you,-by the present, to consider the same as annulled, until we may again renew the same.”
 

 The agency of Delprat continued after this revocation of his credit with Le Roy, Bayard & Co. He continued to solicit consignments for their house in Amsterdam, and to draw bills on them for advances, without any other alteration in his powers, than is contained in a letter of the 6th Feb. 1821, 'whicft contains the following clause. “ The advances, therefore, to be made by you on our behalf, on shipments to our consignments, either from funds belonging to us, in your hands, or by drawing and endorsing the shipper’s draft, must not exceed, henceforthj-one half of the “true invoice.”. As a compensation for this reduction óf the advance to be made in’the United States, J. & N. & R. Van Staphorst, engaged, on the arrival of the shipments, to remit to the consigners, the estimated value of the-cargoes, in- bills on their house in the United States.
 

 Delprat acknowledged the'receipt-of this letter on the 17th of April, 1821, and promised to conform to its directions.
 

 The correspondence between the plaintiffs ahd defendants, respecting Mr. Delprat’s agency, appears to have ceased on the 12th of May,. 1820, when his credit with the house bf the latter was annulled. At least, no subsequent letter appears in the record, until the 9th of July, 1822, when the plaintiffs announced to the defendants the sudden termination of their connex-ion with Mr. Delprat; whose conduct, they said, has been so imprudent as to oblige them, at the samé time* to protest se
 
 *281
 
 veral of his .drafts. Their knowledge, they say, of the former intercourse between Lé Roy, Bayard & Co. and Mr. Delprat, and of the great regard felt for him by those gentlemen, induce them to 'state the chief reasons which compelled them .to this measure. These are, his irregularities in keeping his accounts, and, omission to furnish an account since the 31st-of December, 1820, although the balance then due from him was’ fully 87837 54, being “for the proceeds of gin consigned by us to him; for proceeds of draffs, issued by him on us, for our account, in order to employ the proceeds to make prudent advances w^th,” &c.
 

 They then proceed to state, that Mr. Delprat owed, at that date, upwards pf 82,000 florins, against which he might be entitled to a credit of 86000. The account, they say, has accrued to this height, in a great measure, “ in consequence of shipments made to him for his account, in full confidence of his making us,fbr the amount, remittances; which we till now have not received; though the goods were, with him, for many months.” The letter complains of the large advances made by Mr. Delprat, on consignments, notwithstanding their repeated remonstrances; and dwells on the high opinion they had. entertained of him; “his integrity,” they say, .they “even now will not question.” Thus, the letter proceeds, ‘‘were matters situated, when last Friday, contrary to any thing we could expect or- anticipate, we 'found ourselves drawn upon by Mr. Delprat, for ¡6200, ¿6300, and ¡6500; issued, as he informs us, for the amount of purchases which''lie is making.of articles not yet shipped ;”. and on the other hand, 2d,
 
 £500,
 
 fl.1250, and 1750, issued'on us,, as advances made to Mr. Krafll, already so -much our debtor, on shipments which he made some long time ago, and which Mr. Delprat could clearly perceive, that taken at an average, did; nothing diminish the balance due by him.”
 

 ■ The letter proceeds to state, in substance, that they could choose only between the alternatives, pf allowing the debt due from Mr. Delprat to be -swelled to a still'larger amount; and protesting his bills. .They had chosen the latter, how.ever it might pain their feelings. They express their regret to find, that among the drafts’ to be protested for non-acceptance, and perhaps afterwards for non-payment, are several endorsed by the defendants, for whose honotfs, however, they had intervened.
 

 This letter was received by the defendants on the 1st day of September, 1822. They immediately obtained from Mr. Delprat an order on the plaintiffs, to hold at their disposal all theproceeds of the goods shipped in his name, by the Virgin, and other vessels, and all balancés due to him. This order was enclosed to the
 
 *282
 
 plaintiffs in a letter of the 7th September, 1822, inwhich the*) say, “ We can of course only consider this order as applying to the balance, that may possibly'accrue to him upon the'settlement of your account; and if ahy should accrue, we will thank you to take such legal step's, which you may deem necessary,^ as will place it with us, without fear of contention. His draft?, 'which you may have paid for our account, will probably furnish sufficient authority to enable you to dó so.”
 

 • At the trial, John C. Delprat was examined as a witness. He deposes, that the several bills of exchange, on which this suit was' instituted, were drawn in his capacity as agent, on ¿¿count of, and for the purpose of making advances on shipments consigned to the plaintiffs • and, except that in favour of J. P. Krafft, for ¿0500,'were accompanied by letters of advice. That during the whole period of his agency, he was in the habit of making shipments on his own account, and of drawing for advances on the said shipments, precisely in the saíne manner as when they were made by others; that this was done with the full knowledge and approbation of the said N. & J. & R. Van S.taphorst, who never found fault with; him for doing so; but to encourage him .to make- such shipments, gave him credit for one' half the commission, upon the sales of the shipments,- so made upon his own account. On his cross-examination, the'witness- stated that the bill-for J5500 in favour of ■Krafft, was drawn for shipments, by the Edward, Jason, .and May Flower.' He cannot say when the Edward sailed. The Jason had arrived, and the May Flower had sailed before the bill was drawn. Krafft was at- that time indebted to the plaint-tiffs. , The bill was issued to Krafft,. but was returned to witness,'who. sent' i't\o the defendants. The bills of lading, and the- invoices, were not sent with it. The three bills of the 27th of May, for ¿81,000, were drawn on account of shipments, in-his own name, by the Virgin. She sailed about the 30th •Jaly. They were not accompanied by invoices or bills of lading. The two biffs of the 12th and 18th June, for Tl,000, and for ¿8300, were drawn on tobacco, shipped by the Henry, belonging to the witness and to Mr. Krafft. The bill of lading and invoice did not accompany them. The three bills of the 31st of July, were drawn on the shipments by the Virgin, generally. They were not accompanied by bills of lading or invoices. The defendants received a commission for endorsing ■ his bills on the plaintiffs'.
 

 In making the advances, on shipments on his own account, lie drew on tlie plaintiff's, sent his bills to the defendants, to whom they were charged; and then drew on the defendants, as the money was required,- either on his own. shipments or the shipments of ethers; which bills were credited to the defend
 
 *283
 
 ■ants, lie understands that all his transactions with the defendants, -were carried, by them, into their general account with him. These transactions were not confined to his agency for the plaintiffs. He remains considerably indebted to them..-
 

 He was concerned in shipments with Mr. Krafft, and did a great deal of business with him; but did nob consider himself as a general partner.
 

 The connexion between the plaintiffs and J. C. Deíprat, was formed by the agreement of the 11th January 1818. He was constituted their agent for purposes ¿herein described; and received such powers as were deemed sufficient to enable him to perform thfe.duties which devolved on him. That duty was tp manage their mercantile interest in the United States, •“ consisting chiefly in the forming of new solid connexions, and procuring of consignments.*” To enable him to perform this .duty, he was allowed the faculty to value on them direct, or payable in London, at no shorter date than sixty days sight, for such moneys as he should “.employ,- to make advances on the whole or part of cargoes of current articles;” viz. to the amount of two-thirds of the invoice price, ¡kc. It being understood, that his letters o» Ivice should be accompanied by. the bills of lading and invoices of the goods, on whichtthe advances may have been made.
 

 John C.Delprat, then, had no general-authority to personate the plaintiffs in all respects whatever; but was an agent appointed for particular porposes,. with limited powers, calculated to subserve • those purposes. To procure consignments, it was indispensable-that he should advance money to the consignors, and this money-was to be raised by bills on the plaintiffs. But he was authorized to draw- only for a special purpose, and to a limited extent. Out of the limits assigned to him, he had no power. The plaintiffs not being, as a matter, of course, the acceptors of every bill he might' draw; must have performed some act in relation to the particular bills, which imposes on them, in law, the character of acceptors.
 

 This point-was considered bythis Court, in the case of Cooledge and others
 
 vs.
 
 Payson and others.
 

 Cooledge & Co. held' the proceeds of a cargo claimed by Cornthwaite and Cary, whose claim depended on the decision of this Court, of a case depending,therein. Cornthwaite and Cary were desirous of drawing these funds out of the hands of Cooledge & Co. and offered a bond, with sureties, as an'indemnity, in the event of an unfavourable decision. Cooledge & Co. in a letter to Cornthwaite and Cary, state some formal objections to the bond, and add, “ we shall write to our friend Williams, by this mail, and will state to him our ideas respecting the bond, which he will-probably determine. If Mr. Williams
 
 *284
 
 feels satisfied on this point, he will inform you; and in that case, your draft for 2,000 dollars will.be honoured.”
 

 ■ In answer to the letter addressed by Cooledge & Co. to Wil* liareis, on this subject, he declared his satisfaction with the bond, as to form; declared his confidence, that the last signer was able to meet the whole amount, himself; but that he could not speak certainly of the principals, not being well acquainted with their resources. He added, “ under all circumstances, I should not feel inclined to withhold from them, any portion of the funds for which the bond was given. ”
 

 . On the same day, Cornthwaite and Cary called on Williams, who stated the substance of the letter he'had written, and read a part of it. One of the firm of Payson & Co. also called on him, and received the same information. Two days afterwards, Cornthwaite and Cary drew on Cooledge & Co., for 2,000 dollars, and paid the bill to Payson & Co. who presented it to Cooledge & Co.,’by whom it was Drotested. Payson & Co. sued them as acceptors;
 

 The Court instructed the jurjy that if they were satisfied that Williams, on the application of the plaintiffs, made after seeing the letter from Cooledge & Co. to Cornthwaite and Cary, did declare, that he was satisfied with the bond referred to in that letter; and that the plaintiffs, on the faith and credit of the said declaration, and also of the letter to Cornthwaite and Cary, did receive and take the bill in the declaration; they weve entitled to recover in the action;
 

 The jury found a verdict for the .plaintiffs; the judgment on which was affirmed in this Court.
 

 In this case, the drawee had written a letter to the drawer, promising to honour his bill for 2,000 dollars; if Mr. Williams should be satisfied with a bond of indemnity, which had been placed in their possession. Mr. Williams declared his satisfaction with it, both to the drawer and holder of the bill, within two days after this declaration. In this cage, the promise to accept.was express, and applied to a particular bill, the precise amount of which, was specified in the promise.
 

 The Court, in its opinion, reviews .several decisions in England, on this point; in all of which, the promise to accept was express; and in some of which, the Court declared the opinion; that the promise ought to be accompanied by circumstances, which may induce á third person to take the bill. After reviewing these case's, this Court laid down the rule, “that a letter written within a reasonable time before or after the date of the bill of exchange, describing it in .terms not to be mistaken, and promising to accept it, is, if shown to the person, who af-terwards takes the bill, on the credit of the letter, a virtual acceptance, binding the person who makes the promise.”
 

 
 *285
 
 It cannot be alleged that these bills are brought within this rule. The plaintiffs, therefore, cannot be considered as accept¡ors of them.
 

 But, although the plaintiffs cannot be viewed as the accept- , ors of these bills, it does not follow, necessarily, that they can maintain thé present action. To entitle them to maintain it, the Court must be satisfied that the payment is, in fact, what it professes to be, a payment really for the honour of the en-dorsees. If the drawees, thus refusing to honour the bill, and. thus denying the authority of the drawer, to draw upon them, were bound in good faith ,to accept or pay as drawees; they will not be permitted to change the relation in which they stand to the parties on the bills, by a wrongful act. They can acquire no rights as the holders of bills, paid,
 
 supra protest;
 
 if they weré bound to honour them in théir character of drawees. The. single and unmixed inquiry, therefore, on the second and third questions, is, whéther the drawees were bound to accept or to pay-these bills. And first, were they so bound, because the bills were drawn in pursuance of the authority they had given to the drawer ? This demands a more critical examination of the evidence, than was required when considering the first question;
 

 It is apparent, from the contract of the 11th of January 1818, that Mr. Delprat came to the United States, as the agént of N. & J. & R. Van Staphorst, to manage their mercantile interest;
 
 u
 
 consisting chiefly in forming new solid connexions, and procuring of consignments^’ and also with commercial views of his own.. The principal- object of the contract is to define his authority,- and to regulate his conduct as agent. He is allowed to draw on the plaintiffs, for such moneys as he should employ in making' advances on current’ articles, consigned to his principals, to the amount of two-thirds of the invoice price of articles laden in chartered vessels. He was still further restricted, in his advances, by orders received long before the bills in question were drawn, to one half of the trtie invoice. .’Mr. Delprat’s authority, then, to make advances, was limited at the date of this transaction, to one half the invoice price. One, and perhaps the most usual mode of conducting business of this description; is to draw in favour of the consignor, or to endorse his bill. The agent might, however, if not otherwise instructed, draw immediately on his principal, and advance the money to the consignor, which was raised by the bill. In either case, however, drafts beyond one half the invoice price of the consignments actually made, would exceed, the authority gi^en. Circumstances may exist, which would inipose on the principal the obligation to pay such drafts; but the question wet> are now considering, relates only to the authority under which the bills were drawn. That authority re-
 
 *286
 
 stricter! the agent in the amount of his drafts, to one half the invoice price of the articles actually consigned; and also required him to accompany his letters of advice, with bills of lading and invoices.
 

 Were the bills in question drawn in conformity with powers and instructions thus limited ?
 

 The. first bill on the list is for 500 pounds, drawn in favour ofJ.P. Krafft, on the 23d of May 1822, and endorsed by him to the defendants. The letter of advice, states this bill to be. drawn-ori account of shipments by the Edward, Jason,.and May Flower, as by letter of 21st, which is to be charged to account of P. Krafft. The letter of the 21st is not in the record.-
 

 The shipment by-the Jason had arrived, and the May Flower .had sailed, before the bill was drawn. Mr. Krafft was at the time indebted to N. & J. & R. Van Staphorst. The bill was returned by Krafft to Delprat, and then endorsed by the defendants.
 

 • It does not appear, certainly, who rémitted this bill; although the probability is, that, as it was endorsed by the defendants,' not as purchasers, but for a commission;' it was remitted by Delprat, to whom it was returned by Krafft, as is stated in Delprat’s testimony, or by some person to whom Delprat sold it. It is true, that he further states, that, after the bill was so returned, he sent it to.the defendants; but this was, no doubt, done for the purpose of having it endorsed by the defendants, in order to give it credit. Neither does it appear, from the evidence in the cause, that Krafft accompanied the shipments on account of which this bill was drawn, by any letter of advice, or Otherwise, directing the proceeds thereof to be applied to the discharge of this bill; but, on. the contrary, the letter of advice addressed to the plaintiffs, by Delprat, directed the bill to be. charged, to the account of Krafft, generally. Under these circumstances; taken in connexion with the additional one, that Delprat was concerned, generally, with Krafft, in the shipments madeito the plaintiffs, the Court is of opinion, that there is no material difference between this bill, and those drawn on account of shipments made by, and in the name of Delprat, which are now to be considered.
 

 It has already been stated, that Mr. Delprat was a merchant, trading on his own account, at the same time that he was the agent of N. & J. & R. Van Staphorst. His transactions, in his two characters, were as distinct from each other, as if they had been the transactions of distinct persons. As an agent, he was bound to act “in conformity to the authority and instructions” of his principals. As a merchant, he was himself the principal, and acted in conformity with his own judgment. It would seem, then, that the contract must contain some very peculiar
 
 *287
 
 aud'unusual provisions; to place Mr. Delprat under the authority of the house in Amsterdam, whilst carrying on trade in'the . United States on his own account. Upon reference to the contract, we find a stipulation between, the parties,'in the following words: — “The second undersigned, (Delprat,) binds himself to procure to no person, or persons, in this kingdom, any consignments, or commissions, from himself or .any other, except to the first undersigned; but, on'the contrary, to use' his utmost exertions toward the benefit of the mercantile house Q^f the first undersigned; they being willing, on their side, to facilitate all such commercial operations, as might benefit the second undersigned, without their prejudice.”
 

 This article contains' the only limitation on the entire independence of Mr. Delprat, as a merchant. It is, perhaps; a necessary limitation; which was, in part, the'price of his agency, and for which he finds a compensation in the profits of the business, confided to him. This restriction does not change the character of his transactions as a merchant.' His waiving”the right to consign tó any other house, does not impress on his consignments to the Van'Staphorsts, or on his bills drawn.on those consignments, a character different .from that which would have belonged to them, had his shipments been made from choice. He does not bind himself to make consignments to them; but not to make consignments, to any other house in the Netherlands.
 

 If any doubt could arise from this article; it would be produced by the peculiar manner in which it is expressed. Mr. Delprat binds himself to
 
 procure
 
 to no person in the kingdom of the Netherlands, _any consignments or commissions, from
 
 himself
 
 or any other, except to the Van Staphorsts. The singular application of the word
 
 procure,
 
 to consignments made by Mr. Delprat himself; may be connected with the succeeding article; which authorizes him to draw bills, and may have some influence on its construction.' .In that article, the Van Stap-horts allow Mr. Delprat “the fkculty to value on'them direct, or payable in London,” for such moneys as he shall employ to
 
 make advances
 
 on the whole, or part of cargoes, of current articles consigned to them, to the amount of two-thirds of the invoice price.
 

 It may be said, that, as in the preceding article, consign-. ments made by Delprat, on his own account, were considered as
 
 procured
 
 by him, and were placed on’the same footing with consignments made by others; so in this, the express authority’1 to draw bills, might embrace transactions of both descriptions.. But we do not think that the inaccurate use of words in one article, will justify- a departure from the correct construction of a’succeeding article: unless the. same, words are used, or the
 
 *288
 
 bearing of the one on the other is" such as to require that departure.
 

 The same motives existed' for restraining_the agent from making» as from procuring consignments to any other house in the Netherlands. His utmost' exertions- were required for the benefit of his principals. The restriction, .therefore, might be expressed in-the same sentence; and a slight inaccuracy of language was the less to be regarded, because it could produce no possible misunderstanding with respect to the éxtent of the prohibition.
 

 The third article might not be intended to prescribe the same rules for the conduct of Mr. Delprat, as á merchant, and as-the agent of the Van Staphorsts. As a merchant, he-, hád a right to draw on effects-placed in their hands, independent of" contract. The usage of trade allows such drafts to be made oi) a shipment; and the consigned must pay the-bills, if the shipment places funds in his hands to pay-them. ■ But as agent, his line of conduct was to be prescribed by contract. We must, thérefore, consult-the language of the agreement, in order to determine whether it provides for the future connexion between the parties, farther .than as regards their characters as- principal and agent.
 

 The faculty given to Mr. Delprat, by thé -third article, to value bn the Van Staphorsts, is, ‘Hor such moneys as he should employ to
 
 make advances”
 
 on articles consigned to them. Money laid outy in the purchase of articles on his own account, cannot,with aby propriety, of language, be denominated money employed in
 
 maxing advances
 
 on articles consigned to him. The' distinction.between money
 
 advanced
 
 on articles consigned, and money employed in purchases; although the articles may .he purchased for the purpose of being consigned; is obvious. Money advanced, is always to another, never to the individual making the advance. This language shows, we think, incontestably, that the article was drawn with á sole view to bills drawn by Mr. Delprat, as agent; not on his own account as a merr chant _ .......
 

 _ A subsequent part of the article -gives additional support to this construction. Mr. Delprat is to draw- for two-thirds of the invoice price of . the article, and is himself the judge of the. price which may-be.inserted in the invoice. This.power might, be safeiy confided to him, in making advances toothers; but' might not be trusted to him in his own case. • The case shows the Van Staphorsts to have been men of extreme caution, Their letter to Le Roy, Bayard & Co., enclosing thei.r contract . with Delprat, shows ah unwillingness to commit themselves No him further than was necessary. It is not probable, that they
 
 *289
 
 would have given him an express authority to draw on his own account, on invoices to be priced by himself.
 

 But the language of the article applies, we think, entirely to his bills drawn as agent, not to those drawn as a merchant transacting business for himself.
 

 When examined as a witness, Mr. Delprat says, that during the whole period of his agency, he was in the habit of making shipments on his own account, to the said house in Amsterdam, and of drawing for advances on account of the said shipments so made, precisely in the same manner as when the shipments were made by othérs; and this was done with the full knowledge of N. & J. & R. Van Staphorst, who never found fault with him for doing so; but, in order to encourage him to make such shipments, gave him credit for one-half the commission upon the sales of the shipments, so made on his own account.
 

 The Van- Staphorsts were commission merchants, desirous of extending their business. No doubt can be entertained of their willingness to receive consignments from Mr. Delprat, as well as from others. But this does not prove, that the power given1 him as their agent, to make advances to others, was 'intended to regulate the intercourse between them as merchants. That intercourse was regulated by the general principles of mercantile law; and the contract between the parties, does not show that either was dissatisfied with those principles, or wished to vary them.
 

 This question refers, we presume, to the authority given by th'e contract of the 11th of January 1818. The first article describes the objects which were committed to Mr* Delprat,- by the Van Staphorsts. These were the management “of their mercantile interest in the United States, consisting chiefly in the forming new solid connexions, and procuring of consignments. ”
 

 The second article restrains the right Mr. Delprat might otherwise have exercised, of consigning to other houses iji the Netherlands.
 

 The third authorizes him to draw bills on his principals, for the purposes of his agency, under such limitations as they deemed it prudent to prescribe.
 

 This contract, we think, does not contemplate bills drawn by Mr. Delprat on his own account, as a merchant. The bills mentioned in the declaration, which were drawn in favour of the defendants, and endorsed by them, do not come within tfhe authority given by the contract. No instructions from 'the plaintiffs, extending this authority, appear in the record.
 

 The third question comprehends the whole matter in.' controversy, and has been partly answered, in answering th¿ preceding'questionsV It asks, whethen the plaintiffs were bound
 
 *290
 
 to accept and pay the bills in question; and whether the same-having been paid by the plaintiffs,,
 
 supra
 
 protest,-fortfreiiqnbur •of the defendants, the plaintiffs are entitled to recover the . am hunt of \the defendants ?
 

 The opinion has been already expressed, 'that the bill drawn ■on the 23d of May. 1822, for 500 pounds sterling, in favour of J, P. Krafft, i§ not' distinguishable from those which weredr.awn by Mr. Delprat, to enable him fo purchase articles on his own account, which were shipped to the plaintiffs. In making these shipments, and in drawing these bills, Mr. Delprat acted forhimself, as an independent merchant. The relation between him and the plaintiffs, was that of consignor and consignee. -The obligation of the plaintiffs to accept and pay his bills, depended essentially on the state of their accounts. So far as the information furnished by the case goes, Delprat appears to have been indebted to the plaintiffs. In their letters of 19th July andolOth September 1822, which were given in evidence by the defendants, they state him to be then their debtor; ■ and it .is not shown, that this debt has been discharged. The pdaintiffs, therefore, were not- bound to accept and pay these drafts, unless they havecacted in such a mannér as to.give-fee .holders of the bills a right to'count on. their-being paid...
 

 It is believed tobe a general rule, feat ari. agent vfilh'limit-.ed powers cannot bind his principal when he . transcends' his ‘ power. . It would seem to follow, that a person transacting business with him, on the credit of his principal,' is bound' to know the extent of his authority. Yet, if the principal has, by. his declaration or conduct, authorized the opinion that he had given more. extensive powers to his agent, thjan were in fact given ;' he could riot be permitted to avail himself of the imposition, and to protest bills, the drawing of which his. corn duct had sanctioned. But the defendants in this cause cannot allege that they have been deceived. They were the intimate correspondents of the plaintiffs, from' whom they received a copy of the contract. The letter which transmitted it, requests their friendly supervision of the conduct , of'Mr. Del-, prat, and., desires them not to pay the monéy for which the plaintiffs had' given him a credit with them, in case of “ a moral certainty” thatit worild not be .employed for the purposes of his agency. In-the course of the correspondence. bétweep the plaintiffs and defendants, we .find several letters written during the continuance of Mr. Delprat’s. credit with the latter, .which shows the determination of the former not .to approve of advances beyond that credit. In their letter qf the 24th of June, 1819,. the plaintiffs expressly caution the defendants, sho.uki they think proper to- remit, in Mr. Delprat’s bills, the nature of which they are well acquainted wife, that they (the
 
 *291
 
 defendants,) allow him the same credit that they do qther per-, sons, from whom they take .bills, in the persuasion of their solidity, and of the reality-of'the transaction' on which the bills are issued. They add, “ This is not the effect of any want of confidence in our agent, but merely, profluing from our .invariable rule, to limit and circumscribe the credits wé allow.” The letters from the. defendants show a' perfect understanding* on their part, of the terms on which Mr. Delprat’s bills were to, be taken. On the 11th May, 1819, announcing that he had filled his credit,. they say:. “ In addition to it, helms expressed an anxiety that we should negotiate his drafts oh you, payable in London, for about ¿63000 sterling, or that wé should take his drafts on Amsterdam, for a similar value. The personal regard which we bear for Mr. Delprat, would have induced- us promptly to ac'cede- to his request, had not the restriction laid upon us, of not permitting him to exceed, but for a few hundred dollars, me credit you give him,, and the total-absence of any indication from you of a wish'for us' to 'interfere ip his pecuniary arrangements, in- any- other than'■ the modeymarked by the credit, led us to believe that our negotiations or purchase of his drafts, was neither wished nor contemplated by you. ” And in their letter of the 7th of September,- 1822, enclosing the-order of Mr-. Delprat on the plaintiffs,' for any balances belonging to him in their hands; so far from complaining of the protest of the bills, théy sáy; “We can, of course, only consider thié order as applying to the balance that may possibly accrue to him, upon the settlement of-your account.”
 

 Messrs. Le Roy, Bayard & Co. then, were not deceived by the plaintiffs. Unfortunately for themselves, they placed too much' confidence in Mr. Delprat. They, took -his bills,- as they, were cautioned to do, in the letter of the 24th June," 1819, “in the persuasion of their solidity, and of the reality of-the transaction oh which they .were issued.” If in this they were mistaken, the responsibility and the loss are.their own. The 4th and 5th questions have been.waived by the parties, and do not properly arise in the-case. ' They are <5n exceptions taken in the'trial of the cause, which could not be'brought before the Court after verdict, but on a motion for a new trial, which was not mádé.
 

 The 6th. question, whether a- judgment can be rendered on the verdict of the jury, has been answered, so far as this Court can answer it. We do not understand it as- referring to the amount of the verdict, for oh that the' Circuit Court alone • can decide. ‘ If it is’'intended to repeat, in another form', the question whether the plaintiffs can' maintain their action, 'as
 
 *292
 
 the holders of bills, accepted and paid,
 
 supra
 
 protest, for the honour of the drawers; it is already answered.
 

 The decision of a majority of this Court, on the' points on which the Judges of the Circuit Court were divided, will be .certified in conformity with the foregoing opinion.
 

 This cause came on to be heard, on a certificate of division pf opinion of the Judges of the Circuit Court of the United States, for the Southern District of New-York, and on the points on which the said Judges were divided in opinion, and was argued by counsel, on consideration whereof, This Court is of opinion—
 

 1st. That the authority to John C. Delprat to draw on the plaintiffs, did not amount to an acceptance of the bills.
 

 2d and 3d. That the bills mentioned in the declaration were drawn by the said Delpyat, not under the authority of the plaintiffs, but on his own account; and the plaintiffs were not bound to accept and pay them, unless funds of the drawer came to their hands.
 

 4th and 5th. These questions are understood to be waived-, and do not appear to arise in the case.
 

 6th. The 6th question is decided by the answer to the 2d and 3d, so far as respects the right of the plaintiffs to maintain their .action. On the.
 
 quantum
 
 of damages, this Court can give no ppinion.
 

 All which is ordered to be certified to the Court of the United States, forthc second Circuit and District of New-York.