Hubbard, J.
The bills of exchange, in these cases, were drawn by Henry F. Baker, in New Orleans, by virtue of certain letters written by the defendants to him, which were shown to Isaac Bridge, who purchased the bills as agent for the several plaintiffs. The actions depend, substantially, on the same facts, and have been argued and may be considered together.
It is now a well settled principle of American mercantile law respecting bills of exchange, that when a party holds the written authority of another to draw bills on him, with a promise to accept them when so drawn, a third person, purchasing such bills for a valuable consideration, upon the faith of such written authority, can maintain an action against the writer in his own name, upon the breach of such promise to accept. Coolidge v. Payson, 2 Wheat. 66. Goodrich v. Gordon, 15 Johns. 6. Boyce v. Edwards, 4 Pet. 111. Carnegie v. Morrison, 2 Met. 381. But, to justify such a recovery by the holder, the party drawing the bill must pursue and conform to the authority given, or the writer will not be answerable on his promise.
In the present case, the general principles of the law on this subject are not so much called in question, as the construction to be given to the letters out of which the transactions have arisen. And it will, therefore, be necessary to state the substance of the letters bearing on the case. The etter of April 26th 1843, from the defendants to Baker *11 contained an order to buy five hundred bales of cotton on their account, trusting in his judgment as to price, and giving liberty to pass bills on them for the amount; to which is added a postscript saying, “ it has occurred to us that you may have frequent opportunities to make advances on cotton shipped to this port. We can sell the article as well as any house here, and should be willing to accept against shipments to us, the necessary papers accompanying the bills, for such sums as in your judgment may be safely advanced. Our charge will be five per cent, including a guaranty, as all cotton is sold here on a credit.” This letter was followed by another, under date of May 2d 1843, doubling the order for the purchase, making it one thousand bales, and adding, “ we also authorized you to make advances on shipments of cotton to us for sale, which we now confirm, enjoining you to be cautious not to overvalue the cotton.” Again they wrote on the 10th of May 1843, on the subject of the order for the purchase of cotton, referring to the two letters of April 26th and May 2d; and after speaking of the stock of cotton, and that in their judgment prices would not advance, they add, “ the same remarks will apply- to advances made on consignments. We do not want cotton under limits. Your advances ought not to exceed three quarters the value. Under these restrictions you may go on, and your bills shall be duly honored, accompanied by bills of lading and orders for insurance.'’’’ On the 23d of May 1843, they acknowledge a letter of May 13th from Baker, advising the receipt of their letters of the 26th of April and 3d of May, and of a purchase of 750 bales of cotton for their account, and that he had drawn on them, and was shipping the cotton on that day; and after saying “ cotton will go lower,” they add, “ in such a state of the markets, we shall not expect consignments ; and if any should offer we again repeat our caution about over advances.”
No other letters of the defendants are put into the case, which bear on the question of consignments of cotton. Their letter of May 10th was acknowledged by Baker on the 23d.
*12 The first letter of Baker, which advises of any consignments of cotton, bears date June 2d 1843, directing insurance and annexing a bill of lading of cotton shipped on board the Edward Everett. It advised of certain bills being drawn on them, on account of the consignment. The largest of these hills was noted for non-acceptance. Other shipments were made and bills drawn, some of which were noted when received, but were afterwards paid. None of the bills were accompanied by bills of lading, agreeably to the directions. Baker first notices the protest of his bills in a letter of June 24th, expressing his mortification, as in two instances he says, “ the bills of lading contained in the letter were more than sufficient .to cover the drafts.” One bill of $4500 was refused acceptance and payment, and was returned under protest.
The bill of $770, which is the subject of Murdock’s suit, was drawn on the 8th of July 1843, of which Baker informed the defendants by letter of the same date, but without advising on what account it was drawn. The draft of $2000 in favor of Coolidge & Haskell was drawn on the 10th of the same July, and on the 11th Baker advised the defendants of it, and that it was to enable him, in part, to take up the draft of $4500 which had been returned protested. These two drafts were protested for non-acceptance and non-payment, by the defendants, and in consequence thereof the present suits were brought.
The rule stated by the counsel for the plaintiffs, that where a general power is conferred, though there are limitations and qualifications which may affect the conduct of the agent, and make him responsible to his employer, yet they do not lessen the liability of the principal to a third person, is no doubt in many instances correct; but in our judgment it is not applicable to the state of facts existing in the present case. The agency or authority granted, instead of being general, was confined within certain defined limits, beyond which the agent had no power to bind his employers. The first letter, dated April 23d, while it reposed confidence in his judgment as to the amount that' might be safely advanced, required, *13 as a condition of acceptance upon shipments, that the necessary papers should accompany the bills. And if any doubt might have been raised, as to what the necessary papers were, that doubt was removed in the letter of May 10th, which says that the “ bills shall be duly honored, accompanied by bills of lading and orders for insurance.” The next letter, of May 2d, merely confirms the former, with a caution against overvaluing the cotton. And in the letter of May 10th, received before any bills were drawn, there is a further limit on the authority, viz. that the cotton is not to be “under limits,” and that “the advances ought not to exceed three quarters the value; ” and the last letter, May 23d, merely repeats the caution against over valuation.
Whatever name is given to Baker, whether he is called an agent, or a correspondent acting under a letter of credit, his authority was limited and special. It was an authority to draw bills upon shipments of cotton to the consignment of the defendants, not under limits, the bills of lading of the cotton and orders for insurance accompanying the bills drawn. The value of the cotton shipped was left to his judgment; and though instructed not to advance beyond three fourths of that value, yet so far as third persons might be concerned, (there being no collusion,) the defendants would have been bound by his estimate, though it might in fact exceed three fourths the value. But this authority was not pursued. The bills of lading and orders for insurance did not accompany the drafts. The bills, therefore, were taken by Bridge on his personal confidence in the drawer, and not on the obligation of the defendants to accept them.
If the written authority were of doubtful construction, and the language susceptible of a meaning favorable to the plaintiffs’ views of a general authority to draw for the purpose of raising money to procure the consignments, they would be entitled to the benefit of it. But that is not the fact. Neither was there any intrinsic difficulty in executing the orders by accompanying the drafts with bills of lading and orders to insure. This is a practice common among *14 merchants, when an authority is given to draw upon the making of consignments.
No credit was here intended to be given to the mere name of Baker, as a drawer; but the credit was given upon the shipment and consignment of the property itself, and of which the party required the proof by the proper documents. Not conforming to his instructions, Baker assumed the hazard of the protest of his drafts, when the drawees might doubt as to their own security; and the purchasers of the bills took the same risk. If the bills had been delivered to the consignors of the cotton, the liability of the defendants would have rested on different grounds.
The bills, in most instances, were drawn generally, and to the drawer’s own order, so that the defendants could not distinguish whether they were drawn against distinct shipments or generally on account, and it was the duty of Baker to have made his drafts upon the respective shipments. He was not bound to procure consignments, nor chargeable with neglect in not attempting to procure them. But, undertaking to act upon his instructions, he was bound to conform to them.
It is of the greatest importance that such orders should be adhered to with fidelity; for while they are to be liberally construed, they cannot be departed from with safety to the mercantile community.
'To follow out the argument for the plaintiffs, in this case, to its results, the defendants would in fact be compelled to accept as many bills as Baker might have chosen to draw, on the mere exhibition of those letters, without any corresponding consignments of cotton to sustain them. That is to say, he might have raised money for the avowed object of making advances upon consignments, and then have diverted the funds thus raised to other purposes. Such a general and unlimited power might have been given; and, if given, would have bound the defendants. But the instructions were limited and express, and though they accepted most of the bills, on the belief that the consignments would cover them, yet such acts laid them under no obligation to accept other *15 bills, not drawn agreeably to the directions given. Parsons v. Armor, 3 Pet. 413. The party dealing with a specia. agent must inquire as to the nature and extent of his agency, and keep within the limit. On this subject the rules of law are clear. See Fenn v. Harrison, 3 T. R. 757. Schimmelpennich v. Bayard, 1 Pet. 264. Attwood v. Munnings, 7 Barn. & Cres. 278. Chit. Con. (6th Amer. ed.) 218, and cases there cited. Snow v. Perry, 9 Pick. 539.
In the case of the plaintiff Murdock, the bill was drawn by Baker after a knowledge of the refusal of the defendants to accept all of his bills, and that some of them were protested for non-acceptance. If Bridge saw all the correspondence, he would have understood that the defendants would not accept the bills without the security of property consigned specially to meet them. And if he did not see the whole correspondence, the defendants are not to suffer because he did not call for it; the authority, as shown by the first letters, being clearly a limited one.
In respect to the bill purchased for account of Coolidge & Haskell, the other plaintiffs, the case is still stronger. It was drawn by Baker to put him in funds to pay, in part, one of his returned bills. There was no warrant for such a course on his part, and no obligation on the defendants to accept it. If the defendants unjustly refused to accept the draft of $4500, in consequence of which Baker was injured in his credit, and pat to expense in procuring funds to take it up, his remedy was in a special action upon the case against the defendants, for a breach of promise, and not by redrafts on them.
When a party is misled by the acts of the principal, he will have his remedy against him, though the agent may have exceeded his authority. Schimmelpennich v. Bayard, 1 Pet. 290. But in this case, the defendants, by their noting bills for non-acceptance, gave Baker warning, and all others who negotiated with him on the faith of the defendants’ letters, that they should not hold themselves bound to accept bills drawn generally, without accompanying documents, unless fully protected by previous consignments.
*16 We think the evidence as to the value of cotton in the Boston market, at the time of the drawing of the bills, was rightly ruled out. It is evident from the correspondence, as well as from the nature of the case, that the drafts were to be graduated upon the value of the cotton at the home market, where the party drawing could judge for himself, at the time of his negotiation, and not upon a value at a distant port, in regard to which he could not judge with accuracy. If the value at the foreign market had been contemplated, the defendants, who resided there, would themselves have given the limits to their correspondent and have acted upon their own judgment, and not have left it to his; as he had hut imperfect means of judging. But taking the value at New Orleans as the standard, they confided in his judgment to make the proper estimate.

Plaintiffs nonsuit