### UNITED STATES v. PAYETTE LUMBER & MFG. CO. et al.

### CONKLIN v. COBBAN et al.

(District Court, D. Idaho, S. D.  July 26, 1912.)

Nos. 49 and 255, Consolidated as No. 60.

**1. DEEDS (§ 70*)—FRAUD.**

Where a complainant contracted to sell certain lands lying within a forest reservation for an agreed price per acre, the fact that without her knowledge the conveyances as drawn by the purchaser and signed by her ran to the United States, instead of to himself, and that other papers were presented to and signed by complainant to enable the purchaser to select lieu lands under the statute, did not constitute a fraud which would support a suit in equity to set aside the transaction.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 165–182; Dec. Dig. § 70.*]

**2. PRINCIPAL AND AGENT (§ 171*)—RATIFICATION.**

In a suit to recover lands which were patented to complainant as lieu lands selected in exchange for lands in a forest reservation, which had been conveyed to the United States, but which lieu lands had been conveyed to another under a power of attorney alleged to be invalid, the complainant must be considered as having ratified all proceedings and instruments executed by her relating to the exchange of lands.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 644–655; Dec. Dig. § 171.*]

**3. PRINCIPAL AND AGENT (§ 103*)—DEEDS—INVALID POWERS OF ATTORNEY.**

Complainant and another, owners in common of several thousand acres of land within a forest reservation, made a verbal contract to sell the same at a stated price per acre, conveyances for the several tracts to be deposited in escrow and delivered to the purchaser only on payment for the particular tract. The contract was made in the office and pres-

---

ence of a lawyer who was attorney for the other owner and acting, as complainant supposed, as her attorney also. Shortly afterward a number of papers were brought by a messenger from the attorney's office to complainant and her co-owner for their signature, and were signed without much examination in the belief that they had been prepared or approved by the attorney. Such papers consisted of deeds conveying the lands to the United States, applications for lieu lands with the descriptions left blank, and powers of attorney to convey such lieu lands in blank. Such papers were in fact not seen by the attorney personally, but were prepared by the purchaser, and in some manner returned to him after their execution without the attorney's knowledge or consent. After filing the deeds, he sold certain of the "scrip" to one of the defendants, who filled out and filed the applications, and, after their acceptance, inserted his own name in the powers of attorney, and, acting thereunder, conveyed the lands to his codefendant. Complainant received but a small part of the purchase money; and, after discovering the facts, brought suit to cancel the conveyances made under the powers of attorney and to recover her interest in the lands conveyed, which had been patented to her and her co-owner of the reserve lands. *Held*, that the powers of attorney, having been delivered without complainant's authority or knowledge, carried no implied authority from her to fill the blanks, without which they were void, and the conveyances thereunder did not divest her title; but that, as defendant had purchased the land in good faith and paid for the same, complainant would be required to convey on payment to her of a just proportion of the sum due her under the contract of sale.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–298, 353–359, 367; Dec. Dig. § 103.*]

4. PRINCIPAL AND AGENT (§ 10*)—POWER OF ATTORNEY IN BLANK.

A power of attorney to convey land, executed in blank, like a deed with the name of the grantee left blank, is wholly inoperative until the name of a donee is inserted by some one having authority from the donor.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 21, 22; Dec. Dig. § 10.*]

5. ESCROWS ·(§ 14*)—AUTHORITY OF DEPOSITARY—UNAUTHORIZED DELIVERY.

One authorized by a vendor of land to deliver conveyances or powers of attorney to execute conveyances only on receipt of the purchase price is a special agent or an escrow depositary, and a delivery contrary to such instructions does not bind his principal even in favor of subsequent purchasers without notice.

[Ed. Note.—For other cases, see Escrows, Cent. Dig. §§ 17–20; Dec. Dig. § 14.*]

In Equity. Consolidated suits by the United States against the Payette Lumber & Manufacturing Company, John A. Benson, Joseph C. Campbell, R. M. Cobban, E. B. Weirick, and E. B. Weirick, trustee, and by Mollie Conklin against R. M. Cobban, E. B. Weirick, individually and as trustee, Payette Lumber & Manufacturing Company, and others. On final hearing. Decree for defendants in first suit, and for complainant in second.

C. H. Lingenfelter, U. S. Atty., and S. L. Tipton, Asst. U. S. Atty.
N. E. Conklin and W. B. Davidson, for complainant Conklin.
Richards & Haga and McBride & McBride, for defendants Cobban and Weirick.
Cavanah & Blake, for defendant Payette Lumber & Mfg. Co.
A. A. Fraser, for defendant Campbell.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

DIETRICH, District Judge.   The United States and Mollie Conklin bring separate actions exhibiting the same general controversy, and involving the same general state of facts.   The suits were consolidated for trial, and have now been submitted together.   There is great similarity in the averments of the two bills, but the prayers are wholly different; the demand being, in the one case, that the United States be adjudged the true owner of 3,767 acres of timber lands situate in Boise county, Idaho, and in the other that Mollie Conklin be decreed an undivided half interest in the same land.   A similar bill relating to California lands, but involving the same transactions, was exhibited by the government in the United States Circuit Court for the Northern District of California, which, upon demurrer, was dismissed for want of equity, and, upon appeal to the Circuit Court of Appeals, the judgment of the lower court was affirmed.   United States v. Conklin (C. C.) 169 Fed. 177; Id., 177 Fed. 55, 100 C. C. A. 473.   The facts here disclosed by the evidence are, to say the least, no more favorable to the government than were the averments there held to be insufficient, and upon the authority of that case its bill must be dismissed.

The parties defendant in the remaining suit are R. M. Cobban, E. B. Weirick, and the Payette Lumber & Manufacturing Company, a corporation.   Title to the lands referred to was conveyed jointly to the plaintiff and the estate of Patrick Reddy, deceased, by the United States, whereupon the defendant Cobban, assuming to act under powers of attorney purporting to have been executed in his favor by the plaintiff and the legal representatives of the Reddy estate, transferred the same to Weirick, as trustee, who, in turn, transferred the same to the defendant corporation.   The plaintiff prays that these powers of attorney be held to be void and of no effect, and that she be adjudged to be the owner of an undivided one-half interest in the lands, and for general relief.   The salient facts will now be stated.

Some time prior to the year 1900 Alvah Russell Conklin, the plaintiff's husband, acquired title to lands aggregating approximately 9,600 acres, situate in Inyo and Tulare counties, Cal., and referred to in the record as the "Monache lands."   He conveyed an undivided one-half interest therein to Patrick Reddy, his brother-in-law, who was a member of the law firm of Reddy, Campbell & Metson, of San Francisco.   Subsequently, and before the year 1900, the lands were included within the Sierra forest reserve.   Under a general act of Congress, the owners of such lands, by complying with certain conditions, were authorized to exchange them for other public lands subject to settlement.   To make such exchange, it was requisite that the owner execute a deed conveying the reservation lands, sometimes referred to as the "base," to the United States, and have such deed recorded in the proper county recorder's office, and thereafter file the same, together with an abstract showing a clear and unincumbered title in the United States, in the land office, together with an application to select other specifically described land in lieu thereof; such other land being generally referred to as "lieu" land.

Both Conklin and Reddy died prior to the transactions in 1900 out of which this litigation grows, and their estates were in the process of administration. For some years prior to the death of Reddy, J. C. Campbell was his partner, and upon his death the firm continued as Campbell, Metson & Campbell, and either he personally or his firm acted as counsel for both the Reddy and the Conklin estates. John A. Benson, residing at San Francisco, appears to have been a land agent or attorney, and to have been engaged on a comparatively large scale in dealing in land scrip, and in securing title to public lands. He had discussed with Reddy the matter of purchasing his (Reddy's) interest in these lands, but the negotiations were cut short by the latter's death. In the early part of the summer of 1900 both the plaintiff Mollie Conklin, who had in the meantime succeeded to the interest of her deceased husband, and the representatives of the Reddy estate, which was still in process of administration, being desirous of disposing of the Monache lands, a meeting of the several parties with Benson was arranged for at the office of J. C. Campbell. As to the question whether or not there was more than one meeting at which the plaintiff was present, and as to just what occurred, or was finally agreed upon, the evidence is highly conflicting. There seems, however, to be no doubt that at one meeting, at which an understanding was practically arrived at, the plaintiff and her son, who was a young lawyer, Benson, Campbell, and Reddy's widow, who was also one of the representatives of the Reddy estate, were present. Putting aside for the moment the disputed details, the understanding then reached was that the owners were to dispose of the Monache lands for the agreed price of $3.80 per acre. Plaintiff's version is that this meeting took place in the month of August, 1900, and that the agreement was that Benson should purchase the lands at the price named, such purchase to be completed and the full amount of the purchase price paid within 90 days. Deeds were to be executed and placed in escrow, with instructions to deliver to Benson upon the payment of the purchase price. Upon the other hand, Benson's testimony is to the effect that it was not understood that he was to purchase the base land outright, but that it was to be exchanged for other land, as provided by law, and that he was to make payment only when the titles were approved by the proper government officials. The truth probably is that, upon the one side, the plaintiff, not being familiar with the procedure by which base lands are exchanged for lieu lands, gave little attention to, and did not understand, such explanations as may have been made by Benson, and went away with the impression only that Benson was to purchase, and that she was to deed to him directly, her interest in the base lands. Upon the other hand, Benson, being advised of the conditions under which base lands could be handled and exchanged, and being familiar with the procedure, understood that the owners would execute, and, in due time, deliver such papers as were necessary to make the exchange and transfer. The plaintiff wanted to sell the lands, and was interested particularly in procuring the desired price. Being concerned only with the ultimate result, she probably gave very

little thought to the means by which that result would be reached. In view of the entire record, it is wholly improbable, and I am unable to conclude, that Benson agreed, or that he understood, that he would directly purchase the base lands, or that deeds from the then owners were to convey the title to him personally.

At this point it should also be stated that the record discloses a direct conflict upon the question as to whether or not, in the negotiations leading up to the agreement referred to, and in making the agreement, and in the subsequent transactions still to be related, Campbell was acting in the capacity of attorney for the plaintiff. It is her contention that he was so acting, but by him such relation is emphatically disclaimed. As already stated, he or his firm had been acting for her as the representative of the Conklin estate, and he was at the time the attorney for the representatives of the Reddy estate, but there is no positive or strong circumstantial evidence tending to support the plaintiff's contention that he or his firm consciously acted in such capacity for her personally in this or any other matter. In view of the fact that Campbell had been associated with her brother-in-law, Reddy, and that her son had studied law in his office, and that he, Campbell, or his firm, had, up to the very time of the meeting, acted as counsel for the estate of her deceased husband, she doubtless entertained great confidence in him, and it is entirely probable that she expected him to protect her interests, without giving any thought to the question whether or not he had been expressly retained for that purpose. Upon the other hand, from the entire record, I have concluded that Campbell himself did not understand that he was, in a technical sense, acting as her attorney. While at times he appeared to render services to the plaintiff in connection with the matter, it is to be borne in mind that he was all the time attorney for the Reddy estate, and that the Reddy estate owned an undivided one-half interest in the property, and the interests of the estate as against Benson were therefore identical with those of the plaintiff. In other words, in properly caring for and protecting the interests of the Reddy estate, Campbell could not well avoid the appearance of also protecting the interests of the plaintiff.

It seems to have been understood that, upon being furnished with the necessary data, Benson would, at his own expense, procure abstracts of title, and draft the necessary instruments to effect the exchange, and a short time after the meeting referred to he caused to be sent to Campbell's office numerous papers, with the request that they be executed. At this point the evidence is very fragmentary and very unsatisfactory. Campbell apparently had an extensive practice, and the details of the business were left to assistants and clerks in the office. The papers thus prepared by Benson and delivered at Campbell's office upon two different occasions were apparently taken by one of the clerks or office boys to the plaintiff and Mrs. Reddy for execution. The testimony of the plaintiff is that the first group was brought to the home of Mrs. Reddy, where she, the plaintiff, was temporarily staying. They

hastily scanned some of them, and then, concluding that they would not have been sent for signature unless they had Campbell's approval, they signed them, and turned them back into the hands of the messenger. The number of the papers is not disclosed, but there were many of them. Later on another bunch was presented to the plaintiff by some one whom she recognized as being connected with Campbell's office, at a hotel in San Francisco where she was temporarily staying, and these she signed in the same way and upon the same assumption. Campbell himself testifies that he personally took the notary public to the hospital, and there procured the execution of certain of the papers by one of the Reddy representatives, who was ill at the time. Unfortunately, before the evidence was taken in this case, both of the representatives of the Reddy estate and the notary public died.

Subsequently, from time to time, but under just what circumstances, or how often, or when, does not appear, these papers came into Benson's hands, and they now appear to have consisted of a large number of deeds conveying the base lands to the United States, an equal number of applications, signed by the owners of the base lands, for the selection of lieu lands, a like number of instruments empowering some undesignated person to make selections of lieu lands, and also an equal number conferring upon undesignated persons irrevocable authority to convey the title or titles of the lieu lands to purchasers thereof. It seems that, under the prevailing rules of the land department, the right to make selections of lieu lands was held to be nonassignable, and therefore patents always issued to the grantors of the base lands. It consequently became necessary either for such grantors to make a conveyance to the purchasers, or to authorize an attorney in fact to make such conveyance, and the instruments referred to seem to have been such as were sometimes used to make the necessary transfer complete.

All of these deeds and powers of attorney were signed by the plaintiff and the two representatives of the Reddy estate, and, from the notarial certificate attached, appear to have been duly acknowledged before a notary public. The plaintiff testifies that she never appeared before a notary public or acknowledged any one of the instruments, and that in that respect the certificates are all false. In this position she is strongly corroborated by other evidence, and upon the whole record there is left no room for doubt that her testimony is true.

During the years from 1900 to 1903 the defendant Cobban resided at Missoula, in the state of Montana, and was engaged in the real estate business which was being conducted by a corporation bearing his name. In 1900 or 1901 he and a number of other persons in Montana associated themselves together for the purpose of assembling and placing upon the market titles to valuable timber lands; Cobban being put forward as the active agent of the association. Neither Cobban nor his associates personally knew Benson, Campbell, Conklin, or Reddy; but, in some manner learn-

ing of Benson's possession of the Monache scrip, Cobban negotiated for the purchase of several lots thereof, aggregating approximately 3,723.52 acres, by mail, for the purpose of enabling him and his associates to acquire the title to the lands now in controversy, which were at the time public timber lands of the United States. The scrip was purchased in the ordinary course of business, and at the going price, namely, $4 per acre. From time to time as the scrip was needed, Cobban ordered it from Benson, and the same was sent to a designated bank, either at Butte, Mont., or Boise, Idaho, where the papers were examined by Cobban or his representative, and, they being found to be satisfactory, the purchase price was paid into the bank, and the scrip delivered to the purchaser. This scrip, as it will be understood, was made up of substantially the papers executed by the owners of the base lands as hereinbefore detailed. After purchasing the scrip, Cobban inserted in the blank application to select lieu lands a description of the lands by him selected, and also inserted in one of the powers of attorney such description, together with his own name, and thereupon the papers were filed in the proper land office, and if the same were, upon examination, found to be satisfactory by the Land Department, and the exchange was approved, patent issued, conveying title to the selected lands to the plaintiff and the representatives of the Reddy estate. Upon the issuance of such patent, Cobban, exercising the authority which he assumed he had, as holder of the scrip, either wrote, or caused to be written, his own name in the powers of attorney which had been signed in blank by the plaintiff and her co-owners, and thereupon executed a deed in the name and upon behalf of the plaintiff and the representatives of the Reddy estate, conveying such patented selected land to the defendant Weirick, as trustee, Weirick having been chosen by his associates as their representative, to take the title. Thereafter, Cobban's association having effected a sale of all of the lands thus acquired, Weirick, as such trustee, acting upon behalf of his associates, and with their approbation, for a valuable consideration, transferred the title to the purchaser, the defendant Payette Lumber & Manufacturing Company, in whose name, as has already been stated, the title now stands.

Plaintiff charges that Benson, Campbell, and the defendants conspired together to defraud her; that she has never been paid the stipulated price; that she unwittingly attached her signature to the papers constituting the scrip; that she never in fact acknowledged the execution of any of such papers; that their delivery to Benson was unauthorized and without her knowledge or consent; and that the powers of attorney, when delivered to Cobban, being blank as to the name of the person authorized to exercise the powers, were ineffective for any purpose, and therefore conferred no authority upon Cobban to execute any deed or other conveyance.

[1] We may put aside as being immaterial the fact that the notarial certificates attached to the instruments constituting the so-called "scrip" sold to Cobban were false, in that the plaintiff never appeared

before a notary public or made any acknowledgment at all. As between the parties acknowledgment was not essential to their validity. So also it is thought not to be highly important to determine whether, by the original agreement it was contemplated that title to the base lands should be conveyed directly to Benson, as is asserted by the plaintiff, or was to be relinquished to the United States substantially in the manner testified to by Benson and Campbell. In either view, the plaintiff must have understood that, for a certain specified price, she was to alienate all of her interest in the lands, and, that being the case, the mere fact that the conveyances ran to the United States, and not to Benson, in itself furnishes no adequate ground for the interposition of a court of equity. United States v. Conklin (C. C.) 169 Fed. 177, affirmed 177 Fed. 55, 100 C. C. A. 473; Conklin v. Benson, 159 Cal. 785, 116 Pac. 34, 36 L. R. A. (N. S.) 537. Moreover, there is no substantial foundation for the charge, elaborated at great length in the bill, that Benson, Campbell, Weirick, Cobban, and others conspired to defraud the plaintiff. So far as Cobban and Weirick are concerned, together with their associates and the promoters and officers of the defendant Payette Lumber & Manufacturing Company, it is enough to say that there is no basis for a suspicion even that they purposed to defraud, or consciously participated in any scheme or conspiracy to defraud either the United States or the plaintiff. They purchased the scrip by mail in due course of business, were not acquainted with either Benson or Campbell, and had no knowledge of the facts of which the plaintiff now complains. While there is much in the record to support the view that Campbell failed to properly discharge his obligations to the plaintiff, it cannot be held that he conspired with Benson, or at any time entertained corrupt or improper motives. Such delinquency as in law may be properly charged against him is to be attributed to a want of personal attention upon his part, and either to his neglect to give definite instructions to his subordinates, to whom, in a measure, he intrusted the business, or to their disregard of his instructions, rather than to any design or willingness to wrong the plaintiff. I am satisfied that there was no evil intent. That Campbell owed some duty to the plaintiff cannot be controverted. She intrusted to his keeping the instruments of conveyance which were executed jointly by her and the representatives of the Reddy estate, either because she regarded him as her attorney, or because recognizing him as the attorney for the Reddy estate, and reposing great confidence in him, she assumed that he would deliver the instruments only in accordance with the agreement, of the terms of which he was fully advised. Whether formally employed as an attorney or not, having, with full knowledge of the conditions upon which they were to be delivered to Benson, received the instruments, it was his duty either to return them to plaintiff or to comply with such conditions. This, however, is not an action to determine Campbell's liability, nor is he made a party defendant, and therefore the precise nature of his relation to the plaintiff is material only in so far as it bears upon the effect upon the plaintiff's rights, of the unauthorized and improper delivery of the instruments through his office to Benson,

and by Benson to the defendants, who purchased them for value and without knowledge of any wrongdoing.

[2] And in disposing of that issue we may dismiss from our consideration all those instruments used merely in effecting an exchange of lands with the United States. Such are the deeds executed in favor of the United States, the applications to select lands in lieu of those relinquished, and powers of attorney authorizing the making of such selections. This suit is based upon the theory that the plaintiff is entitled to the fruits of the exchange, namely, the lands patented to her by the United States in consideration of her relinquishment of title to the base lands, and therefore it may be held that, by prosecuting the suit, the plaintiff has ratified all proceedings relating to such exchange. There is, however, no evidence to support the theory that the plaintiff ever authorized or ratified the delivery of any power of attorney "to convey" without the prior payment to her of the full purchase price agreed upon. Whether we accept the theory of the plaintiff or that of the defense, whether the understanding was a transfer directly to Benson of the Monache lands or an exchange thereof with the government, and thereupon a transfer of the lieu lands to Benson or such person as Benson might designate, according to all of the testimony, payment of the agreed price was to precede the delivery of the instruments effecting a transfer of the title or the control of the title from the plaintiff. Such is the testimony of the witnesses for the plaintiff. Campbell in the most emphatic terms so declares, and Benson, in effect, admits that such was the understanding. It is true, I think, that, when she signed the large number of documents sent to her from Campbell's office, the plaintiff acted without fully understanding their legal import, but even if it be held that, having voluntarily attached her signature, she is chargeable with an understanding of their meaning and legal effect, it still remains true that neither expressly nor impliedly did she authorize their delivery to Benson. Campbell testifies that it was not his understanding that such instruments were ever to be executed, and that personally he was wholly unaware of their existence until after this suit was commenced. He never saw them and did not deliver them to Benson or authorize their delivery. Benson ventures no explanation and advances no theory in justification of their delivery to him. In some way, it does not appear just how, they all reached his office bearing false notarial certificates of acknowledgment, and came from either Campbell's office or directly from the hands of the notary public. The delivery was made either by the notary or a subordinate in Campbell's office, but, whether such delivery was the result of fraudulent collusion or only innocent inadvertence, it was not in accordance with the original agreement, and had the authorization or consent of neither Campbell nor the plaintiff.

It may be said generally that there is nothing in the conduct of plaintiff, unless it be her act of signing the powers of attorney and giving them back into the hands of Campbell's clerk, that can be put forward as a substantial reason why she should be denied equitable relief. She did not know, and had no reason to suspect, that the

powers of attorney had been delivered to Benson until long after the Cobban sales had been consummated, and, upon learning of the facts, with reasonable diligence, she executed, and caused to be recorded, in Boise County, Idaho, where the lands are situated, a, revocation of such power. This revocation was filed January 16, 1903, five months before Cobban and his associates, through Weirick, their trustee, sold to the defendant Payette Lumber & Manufacturing Company. INeither expressly nor impliedly has she ratified the delivery of the instruments, and since learning of their delivery she has consistently, and with reasonable diligence, proclaimed her unwillingness to be bound thereby, and has asserted her ownership of the selected lands. · If estopped at all, therefore, or barred by laches, such estoppel or bar· must be found in the act of signing and sending the instruments back· to Campbell's office.

The substantial facts with regard to the payments made to the plaintiff are not in controversy. The amounts paid to her credit on account of the entire transaction aggregate only $2,750. What, if any, part of this amount should be credited to the Cobban sales is not entirely clear, and is left for later consideration. The scrip sold to Cobban alone covered 3,723.52 acres, on account of which, if we credit the plaintiff at the rate of one-half of $3.80 or $1.90 per acre, there became due to her the sum of $7,074.68. These sales were all made, and the money arising therefrom, received by Benson, between the 1st day of February and the 1st day of July, 1901.

At the hearing, counsel for the defendants, assuming that plaintiff had declined an offer of full payment, earnestly insisted that it would be extremely inequitable to permit her to refuse substantially that for which she had contracted, and now recover title to these lands from the defendants, who have already in good faith made full payment, and I was inclined to regard such a view with much favor. But, upon a most careful search of the record, I do not find the assumption of tender well founded. At one point the witness Campbell testified that the plaintiff refused further payments, but the statement is immediately qualified in such a way as to leave it practically worthless. · Benson evidently seeks to leave the impression that plaintiff was unwilling to receive payment, but he seems studiously to avoid any. direct statement to that effect, and clearly all of his testimony upon the point relates to a time long after he consummated the sales to, and received full payment from, Cobban. It is difficult to harmonize Benson's use of the powers of attorney and his conduct generally with the ordinary standards of honesty and fair dealing. In his letter of December 11, 1901, written to Campbell in response to the latter's request for ·a· report as to the status of the whole matter, he uses the following language:

"All of the land, except 400 acres, has been deeded to the United States, and deeds placed upon record, and selections made of other land in accord- ance with the provisions of the Act of Congress of June 4, 1897 (30 Stats. 36).

"This was all, or nearly ·all, located for parties who were desirous of securing title to unoccupied government lands of the United States, under the ,provisions of contracts or agreements which in terms provided that after

the land selected in lieu of the land surrendered had been located and said locations had been accepted by the Commissioner of the General Land Office, and proper evidence furnished thereof, that the parties in whose interests the locations were made, would, upon the delivery of a deed conveying the right of the owners, pay the amounts agreed upon.

"Up to the present date there has not been a single location accepted by the commissioner of the General Land Office. It is my intention just as soon as these acceptances can be had to ask for a confirmation of the sales by the Court so that settlements can be made to both the owners and the parties in whose interests the locations were made. We have been bringing every effort to bear to get the Commissioner of the General Land Office to act upon these matters, and as he has lately added several to the working force in his office it is likely we will not have very much longer to wait."

Clearly he thus intended to give the impression that the original owners still controlled the title, and that no money had been paid by the purchasers, and that payment would be made only upon the delivery of proper deeds by the original owners, whereas in truth the fact was that, months prior thereto, he had received, in installments, the full purchase price for the scrip covering all of the lands described in the bill, and had delivered to Cobban the several powers of attorney purporting to authorize the transfer of title from the plaintiff and the Reddys to unnamed purchasers. By implication the letter recognizes the correctness of the plaintiff's contention that she was to convey title only upon receiving payment in full, and the fact was concealed that the instruments now under consideration were in existence at all. There were doubtless some negotiations looking to a settlement of the whole controversy, and not improbably Benson conditionally offered to make certain payments, but there never was an unconditional or actual tender to the plaintiff of what was clearly due her upon account of the Cobban sales. From the record the inference is unavoidable that if Benson had during the year 1901, or during the larger part, at least, of the year 1902, offered to account for and pay over the moneys arising from the Cobban sales, he would have been met with no hesitation upon the part of the plaintiff in accepting payment, but, as appears from the letter above referred to, he was putting her demands for payment off by evasion and deception. After the plaintiff learned, through inquiries prosecuted by her son, in the year 1902, that her understanding of the agreement was being violated, and especially when it appeared that Benson had come into possession of, and had improperly disposed of, the powers of attorney to convey, not without reason she looked with suspicion upon, and was reluctant to accept, offers of partial payment. She had a right to know the facts, and this knowledge was denied to her. Benson declined to discuss the matter except through or with Campbell, and Campbell, for some reason, was very difficult of access. It may be conceded that had the plaintiff and her son gone about their investigation in a more direct way, and had they insisted upon getting Benson and Campbell together, and, upon having a full and comprehensive report upon the whole transaction, certain unfortunate misunderstandings might have been avoided, and possibly a satisfactory settlement secured, but in passing criticism upon the course pursued we must adjudge the conduct of the plaintiff and her son in the light which

they then had rather than in the light of the facts later disclosed. Not without some apparent reason, they doubtless entertained a suspicion that Benson and Campbell were in collusion for some purpose antagonistic to their interests, and that it would be useless, if not perilous, to advise them of such suspicion until certain facts had been learned from disinterested sources. While the course pursued is not free from criticism, it is not thought to be such as should debar the plaintiff from seeking relief in a court of equity. It may be thought that the fact that the Reddys were paid much larger amounts than were paid to the plaintiff tends strongly to corroborate the theory that plaintiff refused to accept payment, but it seems that from time to time Campbell, putting forward the needs of Mrs. Reddy for money, strongly urged Benson to make advances to her. Campbell testified that he understood that the moneys so paid were not the proceeds of sales, but were advanced from time to time by Benson in anticipation of such sales, and, in view of the statements contained in Benson's letter of December 11th, it is not improbable that from time to time he led Campbell to believe that, under the contract, there was nothing legally due from him, and that the payments which he made were to be understood as advancements only. In that view, Campbell was justified in turning over to Mrs. Reddy alone such sums as he received, for they were by Benson paid to her credit exclusively, whereas it was his duty to distribute equally between her and the plaintiff all proceeds arising from the sales of lands.

[3] We are thus brought to a consideration of what seems to be the controlling issue of the case, namely, to what extent, if at all, is the plaintiff bound by the unauthorized delivery of the blank powers of attorney to convey. The defendant corporation, relying upon the maxim that, where one of two innocent persons must bear a loss due to the injurious act of another, he must sustain the loss who has put it within the power of such other person to do the wrong, earnestly insists that, having executed the powers and returned them to Campbell, her agent, the plaintiff must suffer the consequences of their unauthorized delivery. Upon the facts before it, the Supreme Court of California adopted such view in Conklin v. Benson, cited supra. It is to be said, however, that, while that case involved the same general transactions, the ultimate facts upon which the court seems to have placed its decision are, in some material respects, different from the findings warranted by the present record. In that case it was found that when the powers of attorney were, by Benson, delivered to the purchaser, they were complete, and the inference is drawn that they were in that condition when they left the plaintiff's hands. Here it is conceded that when the plaintiff signed the instruments, and indeed until some time after they were delivered to Cobban, they were blank, at least as to the name of the person authorized to exercise the specified powers. It was further substantially found in that case that all the moneys due on account of the purchase price of the lands had been paid over by Benson to Campbell, and that the delinquency, if any, in making payment to the plaintiff, was with Campbell, the plaintiff's agent, and not with Benson. Here it appears that nothing in

excess of $2,750 on account of the entire transaction was ever paid by Benson to any person to the credit of the plaintiff. In the third place, in applying the principle of the maxim above referred to, the California court appears to have assumed that Campbell and Benson were the general agents for the plaintiff for the sale of these lands, whereas the record here does not support the theory of such general agency. Again, it was there assumed that Campbell, the plaintiff's agent, knowingly delivered the papers to Benson, while here it appears that Benson's possession thereof was without his knowledge or consent.

[4] 1. Under all of the circumstances of the case, did the blank powers of attorney operate to confer upon Cobban power to convey? The answer, it is thought, must be in the negative. The rules by which the validity of a power of attorney to transfer the title to real estate is governed are substantially the same as those which apply to conveyances themselves. If a deed to real estate is executed, with the name of the grantee left blank, the deed is inoperative until the name is inserted by some person authorized so to do. Formerly the rule was that such authority must be evidenced in writing, but it is now held in many jurisdictions that parol authority is sufficient. Devlin on Deeds (3d Ed.) § 456. But, as was said by Mr. Justice Field, delivering the opinion of the court, in Allen v. Withrow, 110 U. S. 119, 3 Sup. Ct. 517, 28 L. Ed. 90, even where the more liberal rule is recognized, there are still "two conditions essential to make a deed, thus executed in blank, operate as a conveyance of the property described in it. The blank must be filled by the party authorized to fill it, and this must be done before or at the time of the delivery of the deed to the grantee named." Putting aside the question as to the time Cobban inserted his name in the blank instruments, it is sufficient to say that he had no authority at all so to do. If it be conceded that such authority need not be in writing, and that it need not even be expressly conferred, it still remains true that in some manner it must emanate from the grantor. It is not pretended that in the present case the plaintiff, in writing or otherwise, expressly authorized Cobban to act as her agent in this respect, and authority, if any there was, arose by implication alone. But from what fact or facts can the inference of such authority be legitimately drawn? Where a grantor receives the purchase price agreed upon and delivers a deed, otherwise complete, from these facts alone, it may, not improperly, be inferred that he intended to authorize the purchaser to insert the name of the grantee in the blank left for that purpose. Such would be a natural inference. But the plaintiff here did not deliver these papers, nor did she receive the stipulated purchase price. They came into Cobban's possession through the fraud of Benson, either actual or constructive, and without the knowledge or consent of the plaintiff, or of her agent, assuming that Campbell was her agent. She had never heard of Cobban, and, prior to the meeting at Campbell's office, Benson had been a total stranger to her. The payment to, and the receipt by, Benson of the purchase money paid by Cobban gives rise to no implication. It is not the payment of the purchase money by the purchaser, but the receipt by the grantor, that tends to disclose the grantor's intent.

Benson had no authority to receive the purchase money for the plaintiff. He was not her agent, and probably never thought of the relation existing between himself and the plaintiff as that of agency. In his transactions with Cobban, he was the vendor, and in his relations with the plaintiff he was the vendee or purchaser. Certainly it would be quite as reasonable to hold that he was the agent of Cobban to deliver the purchase money to the plaintiff as to hold that he was the agent of the plaintiff to receive it. My conclusion is that, when Cobban purchased these instruments, he took them at his peril. Upon their face they appeared to be incomplete, and therefore inoperative, and, to give them effect, it was requisite that the name of a qualified person be inserted by some one authorized so to do. The authority was not conferred by the naked instruments themselves, and Cobban was bound to know that, unless it was evidenced by some writing or express declaration of the plaintiff, he must, if he would rely upon the power which the instruments purported to grant, establish facts from which it could legitimately be inferred. Such facts the record fails to disclose, and the instruments must therefore be held to be inoperative.

[5] 2. It is further thought that, aside from the fact that the instruments were in blank, the plaintiff is not bound by their unauthorized delivery. If it be assumed that Campbell directed or consented to such delivery, he acted in violation of his instructions, and transcended his authority. As clearly understood by all parties, Benson was to receive possession of the deeds or other instruments divesting the plaintiff of her title, or putting out of her hands the control thereof, only after he had paid in full the purchase price. I am aware that the line between a general and a special agency is not always well defined, but in no view of the record can it be held that Campbell had the authority of a general agent to bind the plaintiff. His authority was limited to a very narrow scope. The terms of the sale had all been arranged between the principals in Campbell's presence; Benson was to draft the papers, and, after their execution, they were to be deposited by Campbell in escrow with the Anglo-Californian Bank, with instructions to deliver to Benson upon receipt of the stipulated amount. While Campbell has no recollection that the papers were so to be placed in escrow, he does remember that it was agreed that payment should be made through the Anglo-Californian Bank. But, if the papers were not to be left with the bank, it is difficult to understand why payment through that particular bank, or, for that matter, through any bank, should have been discussed or considered important. Upon the one side it was doubtless insisted that the conveyances should not be delivered until payment was made, and, upon Benson's side, he doubtless desired assurance of such delivery when he tendered payment, and, altogether, it would seem that a deposit in escrow was a very natural course to pursue, and I am inclined to think that the plaintiff's version of the understanding is correct. Campbell's duties, therefore, were few and simple, and his authority limited. Little, if anything, was left to his judgment, and he had no discretion touching the conditions upon which delivery was to be

made to Benson. Under the rule of special agency, in dealing with him and accrediting his acts, third persons were bound, at their peril, to take cognizance of the limitations of his authority. "It is believed to be a general rule that an agent with limited powers cannot bind his principal when he transcends his power. It would seem to follow that a person transacting business with him on the credit of his principal is bound to know the extent of his authority." Schimmelpennich v. Bayard, 1 Pet. 264, at page 290 (7 L. Ed. 138). The power of Campbell was analogous to that of an escrow holder. The understanding was that he should make a deposit of the papers in escrow, and, having failed to comply with that understanding, he must be deemed to have retained them in substantially the capacity of an escrow depositary. Certainly his authority to deliver was no greater than would have been the authority of the Anglo-Californian Bank if, in accordance with the agreement, it had received them, under the stipulated instructions. The unauthorized delivery of an escrow deed does not operate to effect a transfer of title. "The great weight of authority sustains the view that an unauthorized delivery of the instrument conveys no title or gives no right, even in favor of an innocent subvendee, without notice of the conditions or events stipulated in the escrow contract; and the authorities are very strong where the escrow has been obtained or delivered through fraud. The principle on which the doctrine rests is that an instrument delivered in violation of the terms on which it has been placed as an escrow is not, in fact, delivered, and that its possession by the grantee is no more effective to convey title than would be the possession of a forged or stolen instrument. Some authorities proceed on the theory that a depositary is a special agent of the depositor, and therefore, his powers being limited to the conditions of the deposit, one who claims through him takes the risk of the agent exceeding his powers." 16 Cyc. 581. "Until the condition has been performed and the deed delivered over, the title does not pass, but remains in the grantor. If the condition is not performed, the grantee, we have seen, is not entitled to the deed. If the depositary deliver the deed without authority to do so from the grantor, or if the grantee obtain possession of it fraudulently, without performing the condition, the deed is void. The deed thus obtained conveys no title either to the grantee or purchasers under him." Devlin on Deeds (3d Ed.) § 322. While not expressly deciding the precise question, the Supreme Court of the United States, in Provident Trust Co. v. Mercer County, 170 U. S. 593, 604, 18 Sup. Ct. 788, 793 (42 L. Ed. 1156), distinguishing between the case of a bona fide purchaser of negotiable paper, wrongfully delivered by an escrow holder, and that of a purchaser of real estate under similar conditions, seems to quote with approval the language of Chief Justice Bigelow, in Fearing v. Clark, 16 Gray, 74, 76, 77 Am. Dec. 394, as follows:

"The rule is different in regard to a deed, bond, or other instrument placed in the hands of a third person as an escrow, to be delivered on the happening of a future event or contingency. In that case no title or interest passes until a delivery is made, in pursuance of the terms and conditions upon which it was placed in the hands of the party to whom it was intrusted."

Speaking for the Circuit Court of Appeals of the Ninth Circuit, Judge Gilbert, in Balfour v. Hopkins, 93 Fed. 564, 35 C. C. A. 445, uses the following language:

"The authorities are not in entire harmony as to the effect of the delivery of a deed which has been left in escrow to be delivered to the grantee upon the performance of a condition, and which has been wrongfully delivered before the condition was performed. The decided weight of authority seems to sustain the view that such a delivery is inoperative to convey title, even in favor of an innocent purchaser, without notice, unless the grantor has, by some act or conduct of his own, estopped himself to deny the delivery."

In County of Calhoun v. American Emigrant Co., 93 U. S. 124, 23 L. Ed. 826, it was said:

"Beyond doubt, the deed of the lands was delivered to the clerk of the respondents as an escrow, and subject to the condition that it should not be delivered to the grantees until they gave a mortgage to secure the full performance of the agreement under which the deed was executed; but it is equally clear that the condition required to be fulfilled before the delivery could be made was never performed, and the rule is established by repeated decisions that, where a deed is delivered as an escrow, nothing passes by the deed unless the condition is performed."

See, also, Knapp v. Nelson, 41 Colo. 447, 92 Pac. 912; Tyler v. Cate, 29 Or. 515, 45 Pac. 800; Bradford v. Durham, 54 Or. 1, 101 Pac. 897, 135 Am. St. Rep. 807; Powers v. Rude, 14 Okl. 381, 79 Pac. 89; Bowers v. Cottrell, 15 Idaho, 221, 96 Pac. 936.

3. In the third place, whatever may have been Campbell's authority, he did not knowingly deliver the instruments. In some unexplained manner they came into Benson's possession, without Campbell's knowledge or consent. Campbell's positive disclaimer of knowledge is corroborated by the facts and circumstances of the case. It is wholly improbable that, experienced lawyer that he was, he would, knowingly, authorize or acquiesce in the course pursued in this case, and thus needlessly jeopardize the interests of his clients. Whether Benson procured the papers by deception or through the inadvertence of the clerks in Campbell's office, his acceptance and use of them constituted a fraud upon the plaintiff's rights. There was no legal delivery of the instruments, either by the plaintiff or by her agent. Bowers v. Cottrell, 15 Idaho, 221, 96 Pac. 936.

It is to be added that while, as has already been said, the defendants are guilty of no moral wrong, and are wholly exonerated from the charges of fraud preferred in plaintiff's bill, it is doubted whether, in purchasing the scrip, they exercised that measure of care required of those who would claim the protection of the maxim which they invoke. To some extent, as testified to by Cobban, the custom may have prevailed of buying conveyances and powers of attorney executed in blank, but, custom or no custom, such purchase is attended with great hazards. However, aside from that feature of the "scrip," we find that these powers of attorney were signed by the administrators of the Reddy estate jointly with the plaintiff; and, while this fact was apparent upon the face of the instruments themselves, they were accepted without any inquiry on the part of

Cobban as to the legal authority of the administrators to execute them. There was certainly no presumption that these administrators, residing in California, and appointed by, and acting only under, the authority of a California court, had the power to delegate to an unknown agent the authority to convey lands belonging to the estate of their intestate, situate in Idaho. To be sure, this consideration does not relate to the plaintiff's interest in the lands, but if, in the exercise of what would seem to have been ordinary prudence, Cobban had set on foot inquiry concerning the validity of the powers of attorney so far as they concerned the Reddy interests, doubtless he would have discovered facts which would have put him upon his guard as to the plaintiff's rights.

Now as to the relief to be awarded to the plaintiff. Under the circumstances, our purpose should be to protect her rights in such a manner as will be least injurious to the defendants. To grant that for which she specifically prays might work great and unnecessary hardship to them. It is not improbable that expenses aggregating considerable amounts have been incurred in procuring title to the selected lands, and in caring for the timber growing thereon, and in paying taxes and other charges; nor is it unlikely that the lands are now of a value greatly in excess of the amount due to the plaintiff under her contract with Benson. It would therefore seem to be inequitable to award to the plaintiff property the value of which is in a large measure the fruit of the defendants' expenditure, foresight, and care. If the plaintiff receives the amount which Benson should have paid to her, she will have suffered no substantial injury. She will thus have gotten what she contracted for. Time was not of the essence of her agreement with Benson, and it would seem that the rights of all parties can now best be conserved by requiring its substantial performance. In the course of her testimony, the plaintiff declared that what she wanted was pay for the land, and in the course of their argument her counsel reiterated that the plaintiff desired nothing inequitable, but that she was entitled either to the land or the stipulated purchase price. I have therefore concluded that if the defendants will, within a reasonable time hereafter to be specified, pay to the plaintiff the amount due to her, under the terms of the Benson agreement, she will be required to execute to the defendant corporation a proper instrument of conveyance, and thereupon the relief which she specifically prays for will be denied; otherwise, in default of such payment, her prayer will be granted.

My present impression is that the record, as it now stands, does not enable me to make an intelligent finding as to the precise amount due the plaintiff under the Benson agreement, and it is possible that it will be necessary to take further evidence. However, before making any order in the premises, I will hear further from counsel, and to that end the several attorneys are requested to be present in court on Monday, July 29th, at 10 o'clock a. m.