## TEXAS CO. v. QUELQUEJEU.

(Circuit Court of Appeals, Fifth Circuit. February 20, 1920.)

### No. 3375.

1. PRINCIPAL AND AGENT ⟺19, 22(1), 119(1), 122(1)—BURDEN TO PROVE AGEN-CY ON PARTY ASSERTING IT; AGENT'S REPRESENTATIONS INADMISSIBLE.

In an action on a contract made by one as agent for defendant, the burden rests on plaintiff to prove by legal evidence the fact of agency, and that the making of the contract was within the agent's authority, and these cannot be established by his representations.

2. PRINCIPAL AND AGENT ⟺147(2)—DEALER WITH AGENT BOUND TO KNOW HIS AUTHORITY.

One dealing with an agent is bound to ascertain the nature and extent of his authority.

3. PRINCIPAL AND AGENT ⟺103(7)—PRINCIPAL NOT BOUND BY UNAUTHORIZED CONTRACT OF SALE.

A defendant *held* not bound by a contract for the sale and delivery of oil, made by an agent who in fact had no authority to make it, and which was not ratified by defendant, where plaintiff understood that the agent's authority extended only to the taking of orders, to be forwarded to defendant for acceptance or rejection.

In Error to the District Court of the Canal Zone; Wm. H. Jackson, Judge.

Action at law by C. Quelquejeu against the Texas Company. Judgment for plaintiff, and defendant brings error. Reversed.

John D. and M. A. Grace, of New Orleans, La., for plaintiff in error.

Theodore C. Hinckley, of New York City, for defendant in error.

Before WALKER, Circuit Judge, and GRUBB and CLAYTON, District Judges.

CLAYTON, District Judge. The defendant in error, Quelquejeu, a merchant and resident of Panama, R. P. (and hereinafter called the plaintiff), sued the plaintiff in error, the Texas Company, a Texas corporation (hereinafter called the defendant), having its principal place of business in New York City, for $3,000 damages for the breach of "an agreement in writing," which the plaintiff alleged he made "with the defendant company, its agent or agents, in the Canal Zone, whereby the defendant, through its said representative or representatives, agreed to sell and deliver to plaintiff" certain cases of oil, delivery to be made in the Canal Zone on or before December 27, 1917. The "agreement in writing" is attached to and "made integral parts of this complaint," and is in the form of the following two letters:

"Panama, September 27, 1918.

"Mr. C. F. Elder, The Texas Company, P. O. Box 242, Cristobal, C. Z.—Dear Sir:—Referring to conversation of recent date, I wish to place order for further quantity of 1,000 cases Texas Red Star crystalite, 1,500 cases of 2 five-gallon tins, at $1.40 per case f. o. b. New Orleans, less 2 per cent. cash discount; shipment to be effected within 3 months.

⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"This order is placed with the understanding that storage at your warehouse will be free to me.

"Please confirm this at your convenience, and advise the approximate time of shipment, so that I may arrange to cover invoice value in due time.

"Yours very truly,                                            C. Quelquejeu."

"Cristobal, September 30, 1917.

"Mr. C. Quelquejeu, Panama City—Dear Sir: Receipt is acknowledged of your favor of September 27th, according another 1,000 cases kerosene, for which accept thanks.

"I understand the conditions to be the same as on previous orders, price, discount, etc., as per your letter, we agreeing officially to protect the price 30 days, and furnish free storage for 30 days also; but I am sure you will find everything satisfactory in every way. Thanking you for the order, which makes a total of 5,000 cases pending, and for all past favors, we remain.

"Very truly yours,                                    The Texas Company,
                                                          "By C. F. Elder."

The complaint sets out in appropriate form the failure to deliver 4,000 cases of the oil and the consequent damage to the plaintiff.

The defendant company answered with a general denial, and further:

"For a separate defense against the complaint of the plaintiff herein, defendant denies that C. F. Elder, the party alleged in said complaint, was defendant's agent for the purpose alleged, or that C. F. Elder had authority to make or execute or deliver any contract binding the defendant in the manner set out in the complaint herein."

At the end of the hearing the court entered the following judgment:

"The court is of the opinion that Mr. Elder was the duly authorized agent of the company. An agent that is held out to make contracts and offer future delivery of goods in that respect, that is recognized as such, can bind the company just as effectively as if he had a power of attorney or written authorization. Everything in this case seems to indicate to me that he did have that authority. * * * The court therefore finds that the Texas Company is liable. As far as it seems to me—as I have followed the evidence here, that on 2,900 cases there is an average loss of 30 cents per case, which would make $870, and on the remaining 1,100 of the 4,000 which were not delivered pursuant to the contract, it seems to me that it is fair to make an estimate of 40 cents per case, or $440, making a total of $1,310. The court therefore finds for the plaintiff, and assesses damages in the sum of $1,310 and the costs of this case."

The determination of the question of agency will be decisive of the case; therefore nothing else need now be considered. Was Elder defendant's agent for the purposes alleged, and therefore had authority to make the agreement binding upon the defendant, as the plaintiff averred? Or did the defendant "hold out" Elder as its agent to sell oil? Or did the defendant accept or "confirm" the alleged orders, or ratify the alleged agreement for the purchase and sale of the oil?

On the trial plaintiff introduced in evidence the two letters hereinbefore set out. Fischer, the sole witness for the plaintiff, testified that he was connected with the firm of C. Quelquejeu; that from the beginning to the end he conducted the transaction "concerning which this suit has been brought"; that he had handled the matter of the purchase from the company of these cases of oil; that he had dealt "with Mr. Elder as agent of the Texas Company"; and that he had demanded delivery of the oil "from the Texas Company and from Mr.

Elder by letter and telephone, and have no reply from the Texas Company, nor any written reply from Mr. Elder." This witness identified several other letters introduced in evidence, written by Quelquejeu to "Mr. C. F. Elder, The Texas Company, P. O. Box 242, Cristobal, C. Z.," and the several replies thereto written by C. F. Elder, signed "The Texas Company, by C. F. Elder," addressed to "Mr. C. Quelquejeu, Panama, R. de P." This correspondence was had between Quelquejeu, at Panama, and Elder, at Cristobal, and was in relation to the confirmation of the agreement to sell and deliver the oil as mentioned in the two letters which were made the basis of this suit.

On cross-examination Fischer testified that—

"I understood that Mr. Elder had authority to bind the company; that he was advised of prices in New Orleans, and that he was able to do what he was doing; that is what he told me. He was introduced to me by Mr. Shipman as agent of the Texas Company. I understood that he was advised of the current price of kerosene in New Orleans, and I thought that the orders that he put up to his company were confirmed by them; that after these confirmations from his company reached him, according to whatever arrangements they had, he would in turn confirm same. My impression was that Mr. Elder would receive an order—would cable it to his company—and that they would reply, accepting or rejecting it, as the case may be, and he would then confirm the order; in other words, have the order placed in New York, and then answer us. The company never informed us that Mr. Elder had booked our orders. Once we wrote the Texas Company about an order, and Elder asked us not to communicate with the company, as he had ample authority to act. I do not know what arrangements he had with the company. I knew that Mr. Elder had been delaying orders and confirmation, and I knew in advance what was coming along. I managed to have him confirm every order in writing. My understanding was that Mr. Elder would place our orders in New York, and after he had placed them would advise us whether or not the orders were confirmed; that is the reason why I wrote him these letters. In every instance he confirmed the orders in writing. Mr. Elder never showed me any power of attorney from the company. I understood that it was Mr. Elder's duty to place the orders in New York."

In the letter dated October 11, 1917, introduced in evidence, addressed to "Mr. C. F. Elder, The Texas Company, P. O. Box 242, Cristobal, C. Z." and signed "C. Quelquejeu," it is stated:

"Further, I confirm request that you cable your company to forward the shipment booked for October 20th, with American consular invoice to Cristobal, in amount of 1,000 cases."

In the letter dated November 7, 1917, introduced in evidence, addressed to "Mr. C. F. Elder, The Texas Company, Mount Hope, P. O. Box 242, Cristobal, C. Z.," and signed "C. Quelquejeu," it is stated:

"Regarding deliveries of kerosene, I wish to advise that I have continuous difficulties, and if I am not able to make more satisfactory arrangements with your good self or with the Panama government for storage, I shall have to discontinue the business or make arrangements with some other parties, offering me the facilities that are necessary for doing this business. In the same connection I would thank you to inform me if the total quantity pending at present is 4,000 or 6,000 cases; i. e., if my last order for 2,000 cases, completing 10,000 cases, has been accepted or entered by your company, in order to open credit in New York for the corresponding amount."

The witness Fischer was shown a cablegram saying:

"Advance kerosene $1.60. Cannot accept at the price Halphen's last order"

—and signed by Shipman who was the export manager of the company in New York. The witness stated:

"That cablegram was shown to me by Mr. Elder in Colon about October 16, 1917. Mr. Shipman is, I believe, the export manager of the company in New York. At that time I told Mr. Elder that our orders were completely firm, and he assured me that his signature was good enough. So far as I remember, Mr. Elder did not state to me that the company would refuse to ship these orders. As far as I can remember, I brought up this subject when he showed me the cablegram, and I told him that it could not affect our orders, and he agreed to that. Mr. Elder, some time in December, stated to Mr. Quelquejeu that there was some trouble about filling the orders."

The defendant company introduced oral and documentary evidence, the parts of which material to the present inquiry are hereinafter referred to.

[1, 2] The defendant's answer made it incumbent upon the plaintiff to establish the authority of Elder, the alleged agent; for, unless there is legal evidence of his authority to act in the matter, the defendant cannot be held responsible for his acts and declarations. United States v. Boyd, 46 U. S. (5 How.) loc. cit. 50, 12 L. Ed. 36; Pullman Co. v. Meyer, 195 Ala. 397, 70 South. 763. One of the first rules in the law of agency is that the authority of an agent to bind his principal rests upon the power conferred by the principal. As Chief Justice Marshall stated it:

"An agent with limited powers cannot bind his principal when he transcends his powers. It would seem to follow that a person transacting business with him, on the credit of his principal, is bound to know the extent of his authority." Schimmelpennich v. Bayard, 1 Pet. 290, 7 L. Ed. 138.

And the rule is very clearly stated by Mechem, Law of Agency, § 289:

"Every person dealing with an agent is bound to ascertain the nature and extent of his authority. He must not trust to a mere presumption, nor to any mere assumption of authority by the agent. He must at all times be able to trace the authority home to its source."

Hence it is incumbent upon every person dealing with an alleged agent to discover at his peril that such pretended agent has authority, and that such authority is in its nature and extent sufficient to permit him to do the proposed act. Wheeler v. McGuire, 86 Ala. 398, 5 South. 190, 2 L. R. A. 808.

[3] A careful consideration of all the evidence in the case compels the conclusion that the plaintiff did not discharge this burden. It is true there is documentary evidence that Elder was the attorney in fact of the defendant company; but his authority was limited to the duty of registering the company, so as to qualify it to do business in the republic of Panama, and to accept service of legal process there. As a matter of fact, the company never did qualify to do business, and never did any, in the republic of Panama. The uncontradicted oral testimony showed that Elder was employed by the defendant company in the Canal Zone to look after its business with the government

(United States), and to have the care of the company's property located in the Canal Zone. It appears that he had authority to receive inquiries or offers for the purchase of oils, and to refer the same for acceptance or rejection to the company's office in New York City. There was no evidence that he had any authority to enter into the agreement on behalf of the company with Quelquejeu—the agreement which is the basis of this suit. On the other hand, it affirmatively appears from the testimony of Shipman, the export sales manager of the defendant at New York, that Elder had no authority to make any sale of oil, or to enter into any such agreement. And we do not think the facts and circumstances disclosed by the record show that Elder was "held out" by the company as its general agent, or as its sales agent. Nor did the evidence show that the defendant company ever ratified the action of Elder in making the agreement with Quelquejeu. Indeed, the record shows that Mr. Fischer, who handled the transactions and conducted the correspondence for Quelquejeu, from the beginning to the end, "understood" (quoting his testimony) or "thought" (quoting again) that Elder had authority to bind the Texas Company. For instance, he testified:

"My impression was that Mr. Elder would receive an order—would cable it to his company, and that they would reply, accepting or rejecting it as the case may be"

—thus recognizing clearly, we think, that Elder was merely authorized to receive the order, not to accept it. Again, in one of the letters introduced in evidence we find that plaintiff requested Elder "to have my order placed and confirmed"; in another, the plaintiff asked Elder "if you have been able to put my last order through"; and in another he inquired of Elder "if my last order has been accepted by your company." Certainly the testimony does not indicate that the plaintiff really believed Elder had the authority with which the plaintiff sought to clothe him. The letters introduced in evidence, hereinbefore set out or referred to, show conclusively that plaintiff knew Elder would do no more than to transmit to the Texas Company, the defendant, at its home office in New York, such inquiries or offers received by him, and that the option rested with the defendant company to accept or reject any offer.

The plaintiff in this case was not bound to deal with the company's agent, Elder, and if he chose to deal with him it was his duty to learn from the company the limits of Elder's authority. All the evidence, the letters and the oral testimony, show that Quelquejeu knew he was dealing with an agent whose power was restricted, and whose authority extended only to submitting the orders for acceptance or rejection. This appears very plainly from evidence hereinbefore pointed out, as well as from excerpts from the letters, such as the following:

"I would ask you to have my order placed and confirmed before any advance occurs" (Quelquejeu to Elder, August 31, 1917); "You would oblige me by advising at your earliest convenience if you have been able to put my last order through" (Quelquejeu to Elder, September 6, 1917); and "I would thank you to inform me * * * if my last order for 2,000 cases, completing 10,000 cases, has been accepted and entered by your company * * *" (Quelquejeu to Elder, November 7, 1917).

In disposing of the case it may be well to state that, after Elder wrote the letter of September 30, 1917, to Quelquejeu, the defendant shipped directly to the plaintiff at Panama from New Orleans 1,000 cases of oil, and that the plaintiff paid the defendant for the same at its New York office. And the evidence shows that Elder did not sell even the 1,000 cases of oil; he did not deliver it, did not receive pay for it, never at any time had any control over it, or any right to dispose of it. So that Elder had nothing to do with this transaction, so far as the testimony directly shows. It might possibly be inferred that he submitted for acceptance or rejection the order for the 1,000 cases to the defendant at its New York office, but this was not shown; however, if it were shown, it would not establish as a fact that the defendant company ever had any knowledge or information of the order for 5,000 cases, or of the agreement made by Elder at Cristobal, C. Z., for the 4,000 cases, the failure to deliver which is the subject of this suit. Certainly there was no evidence that the defendant company ever received any information about the 4,000 cases until after December 27, 1917, the time limit for the delivery according to the alleged agreement. Very probably the 1,000 cases which were shipped to Quelquejeu are referred to in Quelquejeu's letter of October 11, 1917, addressed to Elder, where he said:

"I confirm request that you cable your company to forward the shipment booked for October 20th, with American consular invoice, to Cristobal, in amount of 1,000 cases."

It is clear that Elder exceeded his authority (he was agent to look after the business of the company with the government in the Canal Zone and to have the care of the company's property there); and it is also manifest that the facts and circumstances in evidence do not bring the case within the rule that, where an agent exceeds his authority, the principal may be bound, if he ratifies the action of the agent; for to constitute ratification there must have been the assent of the company to the act (the agreement here) of Elder, with the full knowledge of the material facts connected with the transaction. Such element or knowledge was not proved. The case does not come within the principle recognized in Clews v. Jamieson, 182 U. S. at page 483, and authorities there cited, 21 Sup. Ct. 845, 45 L. Ed. 1183.

Nor does the case, under the testimony, come within the principle announced in Bronson v. Chappell, 12 Wall. 681, 683, 20 L. Ed. 436; and for the reason the company, which conducted its business from New York, where its headquarters were, did not knowingly or negligently suffer Elder to proceed upon the ground that he had authority from the company, nor did the company adopt and sanction his actions in respect to the agreement. The company is not, therefore, estopped from denying Elder's authority.

After having carefully considered all the evidence, we are unable to conclude that (1) Elder was the general agent of the defendant company; or that (2) he had authority to bind the company by the agreement which he made; or that (3) the company accepted the order for the 4,000 cases; or that (4) the company ratified the agreement made by plaintiff, Quelquejeu, and Elder. On the contrary, we are

convinced that the defendant was not and is not bound, in any aspect of the case, to deliver the 4,000 cases of oil. Accordingly the judgment of the District Court, heretofore entered in this cause, is reversed and annulled; and judgment is now entered in favor of the Texas Company, the defendant, with costs.

Reversed and rendered.