## PERKINS v. BETHLEHEM STEEL CORPORATION et al.

### No. 4079.

Circuit Court of Appeals, Third Circuit.

Aug. 12, 1930.

Irving L. Evans, of New York City, and William Andrew Smith, of Newark, N. J. (Joseph M. Dreyer, of New York City, of counsel), for appellant.

Pitney, Hardin & Skinner, of Newark, N. J. (Corwin Howell, of Newark, N. J., of counsel), for appellee Bethlehem Steel Corporation.

Arthur T. Vanderbilt, of Newark, N. J., for appellee Isaac.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the District Court dismissing the libel as to Abraham Isaac and Bethlehem Steel Corporation.

This suit was brought by the libelant, F. W. Perkins, against Abraham Isaac and A. M. Fogel to recover unpaid freight and demurrage for delay in discharging the cargo of the steamship Lake Gaither, and against the Bethlehem Steel Corporation for damage done to the vessel because a safe berth was not provided for it.

A. M. Fogel was in the business of buying and selling scrap iron. He was in Florida and talked over the telephone with Isaac, who is engaged in the scrap iron business in Elizabeth, N. J. As a result a contract was entered into whereby Fogel agreed to sell to Isaac 1,500 tons of iron at "$14.50 per gross ton f. o. b. delivered at Sparrows Point, Md." The contract provided that Isaac "will advance funds to cover cost of material and also will advance funds for freight and hauling." After this contract with Fogel was made, Isaac entered into an agreement with Luria Brothers, brokers, to sell them the iron which he had bought from Fogel.

Thereafter on February 18, 1926, Isaac entered into another contract to purchase from Fogel 3,000 tons of iron at $14.50 per ton f. o. b. delivered at Sparrows Point, Md., and as in the former contract, he agreed to advance funds to cover cost of material, freight, and haulage. Two days later Isaac entered into a contract with Luria Brothers to sell the 3,000 tons to them. After the contract with Isaac, Fogel, on February 4, 1926, entered into two charter parties with the Western Reserve Navigation Company for the affreightment of iron from Tampa to Sparrows Point, on the steamship Lake Gaither.

Fogel loaded the iron covered by the first contract with Isaac at Tampa and the bill of lading was issued on February 11, 1926, Fogel being the shipper and the Bethlehem Steel Corporation consignee. Fogel indorsed this to Isaac. When the vessel arrived at Sparrows Point she grounded in an attempt to dock. This delayed the discharge of the cargo for several days.

As to the first cargo, F. W. Perkins, as-

signee of the Western Reserve Navigation Company, owner of the vessel, brought suit to recover part of the unpaid freight and the demurrage for the delay caused by the vessel's grounding.

As to the second cargo, when the vessel was ready to load, Fogel failed to furnish the cargo according to contract and the vessel was compelled to take on another cargo. Suit was brought to recover damages for the breach of this contract.

The suit was brought against Isaac on the theory that he was "associated" with Fogel as partner and so was responsible for the unpaid freight and demurrage on the first cargo and for the damages caused by the breach of the contract in failing to furnish the second cargo.

As to the Bethlehem Steel Corporation, suit was brought against it on the theory that it became liable to the libelant because through its own acts or those of its agents it became in some way responsible for the damages which the libelant suffered on account of the grounding of the vessel in trying to land at Sparrows Point.

The learned trial judge found as a fact that Isaac was not a partner of Fogel; that Fogel might have represented to the Western Reserve Company in negotiating the charter party that Isaac was "associated" with him as partner, but if he did so that of itself would not make Isaac a partner. At all events, the Western Navigation Company was satisfied to take Fogel's signature alone on the charter party.

There is no proof that Isaac and Fogel ever shared profits, nor did Isaac ever say or do anything from which the libelant could legally infer that he was a partner of Fogel. The fact that in the contract whereby Isaac agreed to purchase the iron from Fogel, he agreed to advance money to cover the cost of material, freight, and haulage, is no ground from which the libelant can draw the conclusion that Isaac was a partner of Fogel.

The Bethlehem Steel Corporation appears to have been named as consignee in the bill of lading for the first cargo, but it did not receive it. That corporation neither has an office at Sparrows Point nor owns the dock there; nor did it give any directions to the libelant or the captain with respect to docking the vessel; nor after the vessel had grounded did it give any directions or do anything else with respect to releasing the vessel with tugs. Notice was given to a Mr. Upp, through whom it was hoped to fasten the responsibility on the Bethlehem Steel Corporation, at Sparrows Point, that there was a demurrage charge of $350 per day, but he was in no way connected with that corporation.

The libelant contends that the District Court erred in holding that the libelant sought to impose liability on Isaac upon the theory of partnership only, whereas he was responsible individually also, although libelant frankly admitted that he did not as a fact know the relationship between Isaac and Fogel. He further says that they were jointly and severally liable, and that Isaac by reason of his conduct is estopped from denying such liability.

The learned District Judge said, "The theory upon which the libellant seeks to impose liability upon Isaac, is that he was a disclosed partner of A. M. Fogel, although not mentioned in the charter party," and then stated the facts of his relation to Fogel and this transaction and concluded that Isaac did not share profits with Fogel "nor was any word said by Isaac from which the libellant could infer that he was a partner of Fogel's."

Looking at this appeal as a trial de novo, The Canadia (C. C. A.) 241 F. 233; The Edgewood (C. C. A.) 280 F. 821; The John Twohy, 255 U. S. 77, 41 S. Ct. 251, 65 L. Ed. 511, we are of opinion that the evidence does not show a partnership between Isaac and Fogel. The evidence shows simply that Isaac purchased from Fogel iron at a stipulated price per ton and advanced to him the money to cover the material and freight. Anything that Fogel might have told Captain Pettersen in order to effect a charter party with him without the authority or knowledge of Isaac did not bind Isaac or make him a partner. We do not think that Isaac's words or conduct show that he was "associated" with Fogel as a partner, nor are they inconsistent with his position as a mere purchaser who had advanced money and was trying to get the material which he had purchased. We do not share the feeling of the libelant that the two contracts with Fogel were evidence of a fraudulent scheme concocted to defraud the libelant. We think that the conduct of Isaac is consistent with his position of bona fide vendee who had advanced money on a bona fide contract. He is therefore not estopped from asserting that he was not a partner of Fogel or jointly engaged in business with him or the real party in interest. We therefore hold that Isaac is not liable individually or as a partner of Fogel and the libel as to him was rightly dismissed.

The libelant contends that the Bethlehem Steel Corporation, the consignee of a cargo, the charterer, and the holder of a bill of lading, each and all, owed the duty to provide a safe berth for the Lake Gaither to discharge.

The Luria Brothers purchased the iron from Isaac, but there is no evidence that the iron in question was purchased for or sold to the Bethlehem Steel Corporation. It may be, however, that one of its subsidiaries did receive it. The bill of lading was indorsed to Isaac by Fogel the day it was issued, which was perfectly natural and proper, since Isaac had advanced the money to cover the material, haulage, and freight.

The District Court found that: "The Bethlehem Steel Corporation is a holding company. It does not own the dock where the vessel was discharged and is engaged in no business. So as to it the libel was dismissed." This conclusion was based upon positive testimony of the Bethlehem Steel Corporation that it did not own the dock at Sparrows Point where the vessel landed with her cargo; that it did not carry on any business there or elsewhere; and that it did not order the cargo, nor receive it.

On the other hand, the libelant drew inferences from certain alleged facts that the Bethlehem Steel Corporation owned the dock and carried on a business there. One fact from which he inferred ownership was the allegation that there were signs on the dock and buildings bearing the name of the Bethlehem Steel Corporation. Some of these alleged facts, however, on which libelant relies, are questionable and from others the inference of ownership of the dock and conduct of business there is a non sequitur. As to the signs, Mr. J. T. Wrigley, witness for libelant, was questioned by the trial judge and testified as follows:

"The Court: And were there any signs up there telling you whose dock it was?

"The Witness: I am not certain, but there was equipment on that dock, there was traveling cranes and there was a railroad, a spur, coming down that dock with engines and cars, and I am not absolutely certain but I believe some of that equipment was marked 'Bethlehem Steel Corporation.'

"The Court: Don't you know whether it was or whether it was not?

"The Witness: I could not say for an absolute certainty.

"The Court: You see you are asking me to form my conclusions that it was from something you are not willing to state."

Mr. Upp is alleged to have said that he was employed by the Bethlehem Steel Corporation. In the first place, this is denied by the Bethlehem Steel Corporation, for it denies that it has any business or does anything there. If Upp were employed by the Bethlehem Steel Corporation or were its agent, it would be necessary for the libelant to prove the scope of his authority before the principal could be bound by anything that he said or did or failed to do or say with respect to the movement of tugs and the giving of orders in the effort to release the vessel from her grounding. Texas Company v. Quelquejeu, 263 F. 491 (C. C. A. 5); Jones v. Mencik, 286 F. 890 (C. C. A. 3). Other inferences are drawn from exhibits, some of which were not admitted in evidence and others of which related to the Bethlehem Steel *Company*, a corporation organized and existing under the laws of the state of Maryland, and not the Bethlehem Steel Corporation, which was organized under the laws of the state of New Jersey.

It is true, as libelant asserts, that a consignee or wharfinger who maintains a wharf for the delivery of goods to himself or to others for wharfage must exercise reasonable care and skill, according to the circumstances of the particular case, to see that a safe berth is provided. Kenny et al. v. Balbach Smelting & Refining Co. (D. C.) 6 F.(2d) 671. The difficulty here is, not with the law, but with facts of the libelant's case.

On a careful review of all the facts, we think that the District Court properly dismissed the libel as to the Bethlehem Steel Corporation and there is nothing in the trial before us to cause us to reach a different conclusion.

The libel is therefore dismissed as to both the Bethlehem Steel Corporation and Abraham Isaac.